[No. S003813. Mar. 8, 1990.]

DAVID M. KENNICK, a Judge of the Municipal Court, Petitioner, v.
COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

298

**COUNSEL**

Totaro, Engels & Shanahan, Totaro & Shanahan, Maureen J. Shanahan, Michael R. Totaro and Gilbert L. Flanders for Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert F. Katz and Susan D. Martynec, Deputy Attorneys General, for Respondent.

## OPINION

**THE COURT.**\*—The Commission on Judicial Performance (commission) has filed in this court its recommendation that David M. Kennick, a judge of the Municipal Court for the Los Angeles Judicial District, be removed from office. (See Cal. Rules of Court, rule 919(a).[1]) Accompanying the petition were the commission's findings of fact and conclusions that the judge had committed "wilful misconduct in office" (willful misconduct) and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (prejudicial conduct), and was culpable of "persistent failure or inability to perform the judge's duties" (persistent failure) (Cal. Const., art. VI, § 18, subd. (c)).

In response, the judge (petitioner) filed a petition to modify or reject the recommendation. (See rule 919(b).) Thereafter, he retired from office (Gov. Code, § 75033.5). He then sought to withdraw his petition and requested dismissal of this proceeding as moot. We denied the request by a minute order dated February 23, 1989, in which we explained that to implement the constitutional provisions that make a removed judge ineligible for judicial office and suspend him or her from practicing law in California pending further order of this court (Cal. Const., art. VI, § 18, subd. (d)), it is necessary to determine whether removal of petitioner from office would have been warranted had he not retired and, if so, whether he should be permitted to practice law.

After the filing of that order, petitioner informed us by letter of his willingness, as a basis for dismissal, to agree to his ineligibility for future judicial office and suspension from the practice of law.[2] He now contends

---

\*Before Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Kaufman, J.†

---

†Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

[1] All references to rules are to the California Rules of Court unless otherwise indicated.

[2] On December 8, 1988, before issuing the minute order denying dismissal, the court sent petitioner a letter inquiring whether he would agree to ineligibility for judicial office and suspension from law practice if this court were to "enter an order suspending petitioner from the practice of law and dismissing the proceeding without prejudice to reinstatement should petitioner seek either judicial office or to set aside the order suspending him from the practice of law." When no assent to the conditions was forthcoming, the court filed the order denying dismissal and resolved to defer further consideration of petitioner's mootness contentions until the hearing of this matter on the merits.

Petitioner thereafter sent us a personally signed statement, attached to his counsel's letter of March 22, 1989, reading as follows: "I, David M. Kennick, a retired judge of the Los Angeles Municipal Court, *pursuant to an offer I understand was made by the California State Supreme Court,* hereby agrees [*sic*] that I am ineligible for judicial office in the future and also

that this willingness creates an additional basis for dismissal based on mootness. He further contends his fitness to practice law should be determined in proceedings before the State Bar.

As will be explained, we have concluded that this proceeding is not moot and that we should proceed to a determination of the merits of the commission's report and recommendation of removal. We have further concluded, after independently reviewing the record, that petitioner should be censured for willful misconduct and prejudicial conduct and ordered removed from office on the sole ground of persistent failure or inability to perform his judicial duties, but that he should be permitted to practice law if he passes the Professional Responsibility Examination.

Petitioner was a judge of the Municipal Court, Los Angeles Judicial District, from June 1972 until his retirement in July 1988. Pursuant to a preliminary investigation (rule 904), the commission served him on December 10, 1986, with a notice of formal proceedings (rule 905) and on March 13, 1987, with an amended notice (rule 911), alleging facts charged to constitute willful misconduct, prejudicial conduct, and persistent failure. He filed an answer (rule 906), and in May 1987 three special masters held 10 days of evidentiary hearings on the issues thereby presented (rules 907-910). The masters' report to the commission (rule 912) found most, but not all, of the alleged facts to be true and concluded that each true fact, or set of facts, sustained a charge of willful misconduct, prejudicial conduct, or persistent failure.

The commission's report, filed with this court in January 1988, confirmed virtually all the masters' findings and found additional facts that the masters had concluded were not proved. The commission also differed from the masters in its assessment of particular acts as willful misconduct or prejudicial misconduct. The commission's findings of fact and conclusions of law were unanimous. The recommendation of removal was by a vote of eight to one.

The commission's findings, which are in eight counts, deal with five factual situations, beginning with the arrest and conviction of petitioner for

---

agrees [*sic*] to entry of an order suspending me from the practice of law." (Italics supplied.) His attorney's letter of March 21, referring to "the Court's proposal of December 8, 1988," makes clear that the mention of an "offer" in petitioner's statement was a reference to the court's aforementioned letter.

Still later, on April 17, 1989, petitioner sent us an additional signed statement as follows: "I, David M. Kennick, a retired judge of the Los Angeles Municipal Court, as an additional part of an agreement signed recently by me and mailed to the Supreme Court by my counsel, do hereby further stipulate that the agreement and/or stipulations are made by me, without my having the right of revocation of any part of the agreement or stipulations. I further stipulate that I will not in any way, move to re-open any part of my case, including, but not limited to, requesting that any order entered by the Supreme Court pursuant to the agreement, be set aside or modified."

drunk driving in August 1985. It is found that he was rude and abusive toward the arresting officers and refused to take field sobriety or blood-alcohol tests (count two), that he sought preferential treatment because of his judicial status and asked an officer if "the paperwork could get lost" before it reached the court (count one), and that he was convicted of driving under the influence of alcohol on a plea of nolo contendere (count three). A second group of findings specifies numerous instances of demeaning, rude, impatient, or abusive behavior, and denial of litigants' and attorneys' rights to be heard, both on the bench and in chambers (counts four and six). Next are findings that petitioner favored certain attorneys in appointing counsel for indigent defendants (count five). In another count it is found that in a long conversation with a waitress at a restaurant, petitioner implied she should not worry about a drunk driving arrest (count seven). Finally, it is found that petitioner's excessive absences from the courthouse, and his cessation of work altogether at the beginning of 1987, constituted persistent failure or inability to perform judicial duties (count eight).

## EFFECT OF PETITIONER'S RETIREMENT

■ Petitioner contends his retirement has made this proceeding moot because we no longer can grant the relief sought by the commission, i.e., his removal from office. (See *Paul* v. *Milk Depots, Inc.* (1964) 62 Cal.2d 129 [41 Cal.Rptr. 468, 396 P.2d 924] [proceeding to enforce marketing regulation rendered moot by defendant's bankruptcy and cessation of business].) Article VI, section 18, subdivision (d), of the California Constitution, however, provides: "A judge removed by the Supreme Court is ineligible for judicial office and pending further order of the court is suspended from practicing law in this State." Thus, the filing in this court of the commission's recommendation of removal placed in issue (1) whether petitioner should continue in the judicial office which he then held, (2) whether he should be eligible for *any* judicial office, and (3) whether he should be suspended from the practice of law in California until further order of this court.

The statute under which petitioner retired provides that "[a]n election to retire" thereunder "shall be without right of revocation, and upon such filing [of the election] said judge shall be deemed retired with receipt of benefits deferred until herein provided, and the judicial office from which he or she has retired shall become vacant." (Gov. Code, § 75033.5.) Petitioner's election to retire therefore eliminated any possibility of his continuing in the judicial office he was holding at the time of the commission's recommendation. His retirement did not, however, foreclose his future eligibility to serve as a judge (see Cal. Const., art. VI, § 15 & 5th par. of § 6), and that eligibility remained for determination in this proceeding.

Further, petitioner's retirement did not resolve the question whether he should be suspended from the practice of law pending further order of this court. ■ Petitioner contends that the suspension issue is not properly before us and instead should be a matter for the State Bar. He claims that suspending him from law practice in this proceeding would violate his constitutional rights to due process and equal protection of the laws. Due process would be violated, he argues, because (1) he was not notified as to which of the charges underlying the removal recommendation would be a basis for suspension from practice or informed of the potential term of suspension, and (2) there has been no hearing on how these charges relate to his right to law practice.

No such notice was required. Rejecting a similar due process claim under a statute authorizing automatic suspension or disbarment of an attorney convicted of a crime involving moral turpitude, this court held that notice of the criminal proceedings was constitutionally sufficient. "The law informs [the accused attorney] that one of the results of his conviction will be his subsequent disbarment . . . . This answers the constitutional requirement that he shall have due process of law before he can be deprived of his right to practice." (*In re Collins* (1922) 188 Cal. 701, 708 [206 P. 990, 32 A.L.R. 1062]; accord *In re Rothrock* (1944) 25 Cal.2d 588, 592 [154 P.2d 392].) So here, petitioner received the commission's notice of formal proceedings expressly charging him with conduct constituting grounds for removal from office (Cal. Const., art. VI, § 18, subd. (c)) and had notice from the Constitution itself that a removed judge would be automatically suspended from law practice unless and until this court ordered otherwise (*id.*, art. VI, § 18, subd. (d)). Petitioner also knew, or should have known, that this court, in responding to any recommendation of removal, would consider only the charges sustained by the commission. (*Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 622 [175 Cal.Rptr. 420, 630 P.2d 954].) Whether the record of the commission's proceedings pertaining to those charges discloses grounds for declining to suspend petitioner from law practice upon removal from office is a legal question that petitioner can and does address before this court.

■ Petitioner claims that suspension from law practice would deprive him of equal protection of the laws because, he argues, there is no rational basis for subjecting an attorney who happens to be a removed judge to disciplinary sanctions not applicable to other attorneys. To the contrary, California law makes a reasonable distinction between suspension from law practice based on the attorney's conduct *while a judge* and suspension or disbarment that is based on other conduct and ordinarily arises out of proceedings before the State Bar. Investigation of judges' conduct for purposes of judicial discipline is entrusted to the commission, and if this court

accepts the commission's recommendation of removal, the question of suspension is determined by this court from the record of proceedings before the commission, without the necessity for further factual investigation.

■ Finally, petitioner contends that even if his retirement alone did not make this proceeding moot, mootness does result from his retirement plus his willingness to stipulate to his ineligibility for judicial office and to the entry of an order of this court suspending him from California law practice. (See fn. 2, *ante*.) He claims he should be treated in the same manner as an attorney who seeks to resign from the State Bar while disciplinary charges against the attorney are pending. Such a resignation is effective only if accepted by this court on the State Bar's recommendation. (See rule 960.) Both an attorney whose resignation is accepted and a removed judge, however, are eligible for reinstatement to the bar upon a sufficient showing of rehabilitation. The attorney may resume practice by undergoing the proceedings required for reinstatement after disbarment. (See Rules Proc. of State Bar, rule 660 et seq.)

Reinstatement to law practice of the removed judge is authorized by article VI, section 18, subdivision (d), of the Constitution. That subdivision makes the removed judge "ineligible" for judicial office but merely "suspended" from law practice. Suspension, in contrast to ineligibility, connotes temporary rather than permanent disqualification. Also, the suspension is effective "pending further order of [this] court" and is therefore subject to our later reconsideration. The possibility that petitioner would be the subject of such a reinstatement proceeding before this court is not precluded by his supplementary offer to refrain from moving to reopen any part of his case and from requesting that any order suspending him from law practice be set aside or modified. (See fn. 2, *ante*.) An application for reinstatement to practice would not require setting aside or modifying the suspension *order* because the suspension itself imposes only a temporary disability that can be removed on the basis of subsequent events. Thus, even petitioner's augmented offer does not preclude the possibility of a reinstatement proceeding.

A necessary foundation to any such proceeding would be a record of the reasons for petitioner's suspension, which necessarily would inhere in the reasons for the event giving rise to the suspension, i.e., his removal from judicial office. There appears no practicable way to create such a record except to go forward with the present proceeding.

An analogy to State Bar proceedings is again instructive. An attorney who has been allowed to resign from the State Bar during the pendency of disciplinary proceedings may resume practice by undergoing the proceed-

ings required for reinstatement after disbarment, including a State Bar investigation, a public hearing before a hearing panel, a favorable recommendation to this court, and our acceptance of that recommendation. (See Rules Proc. of State Bar, rules 225, 660 et seq.) ■ In considering a recommendation of reinstatement after *disbarment,* this court must consider "the evidence of present character . . . in the light of the moral shortcomings which resulted in the imposition of discipline. [Citation.]" (*Roth* v. *State Bar* (1953) 40 Cal.2d 307, 313 [253 P.2d 969]; accord *Tardiff* v. *State Bar* (1980) 27 Cal.3d 395, 403 [165 Cal.Rptr. 829, 612 P.2d 919].) Yet if the attorney has been allowed to resign and thus avoid disciplinary proceedings, no such grounds for discipline will have been established. To fill this gap, acceptance of resignation may be conditioned upon perpetuation of testimony concerning the attorney's conduct pertinent to his or her fitness to practice law. (Rule 960(c); Rules Proc. of State Bar, rule 650 et seq.) This step makes it possible to consider a resigned attorney's application for reinstatement in light of *evidence* of the attorney's preresignation conduct, in lieu of findings on that subject.

■ Similarly, if we were to suspend petitioner from the practice of law and then dismiss this proceeding as he requests, he would be entitled to apply for reinstatement to practice. Determination of the application would require our consideration of whether petitioner had presented proof of rehabilitation sufficient to overcome the grounds for suspension (see *Tardiff* v. *State Bar, supra,* 27 Cal.3d 395, 403; *Roth* v. *State Bar, supra,* 40 Cal.2d 307, 313). A necessary foundation of that determination, of course, would be the ascertainment of what grounds, if any, had warranted suspension in the first place. That inquiry would necessitate resolution of the merits of the present proceeding, i.e., whether the commission's recommendation of removal from judicial office should be sustained and, if so, whether the grounds for removal also constituted grounds for suspending petitioner from law practice. The only practicable way to resolve the merits would be for the commission to appear before us in the reinstatement proceeding to defend its findings and recommendation of removal; yet the commission would then be burdened by all the adverse consequences of the delay between dismissal of the present proceeding and the hearing of the application for reinstatement, e.g., staleness of the record, the dimming of counsel's recollections, and changes in commission personnel.

Thus, to dismiss this proceeding simply because of petitioner's retirement and temporary acceptance of some of the consequences of removal from office might well result in our simply postponing, rather than forgoing, consideration of the merits of the commission's recommendation of removal and the question whether, if the recommendation is accepted, the conduct warranting removal calls for suspension of petitioner from the practice of

law in this state. Because of the practical difficulties such postponed consideration would raise, we decline to follow this course.[3]

In light of this conclusion, we need not consider the other reasons urged by the commission for immediately reaching the merits, e.g., protection of the integrity of the judicial system (see *Judicial Inquiry and Review Bd.* v. *Snyder* (1987) 514 Pa. 142 [523 A.2d 294, 298]; *Matter of Probert* (1981) 411 Mich. 210 [308 N.W.2d 773, 776]), preservation of public confidence in the judiciary (*Matter of Yaccarino* (1985) 101 N.J. 342 [502 A.2d 3, 30-31]), and provision of guidance to other judges (see *In re Weeks* (1983) 134 Ariz. 521 [658 P.2d 174, 176]).

### APPLICABLE STANDARDS

We turn to the merits of the commission's report and recommendation of removal. Removal may be justified by any of the three forms of dereliction found here: willful misconduct, prejudicial conduct, or persistent failure to perform duties, all as defined in article VI, section 18, subdivision (c) of the California Constitution (art. VI, § 18, subd. (c)).[4]

■ Willful misconduct, or "wilful misconduct in office" (art. VI, § 18, subd. (c)), has two elements: it must be *willful,* i.e., done with malice or in bad faith, and it must be committed *in office,* i.e., while acting in a judicial capacity. (*Gonzales* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 365 [188 Cal.Rptr. 880, 657 P.2d 372]); *Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 283-284 [110 Cal.Rptr. 201, 515 P.2d 1].) The element of bad faith, or malice, must meet a two-pronged test: the judge must have "(1) committed acts he knew or should have

---

[3] Shortly before oral argument (at which petitioner did not appear), counsel forwarded to us a copy of a letter from petitioner to the State Bar, dated December 8, 1989, stating in pertinent part as follows: "I . . . hereby resign as a member of the State Bar of California and relinquish all right to practice law in the State of California and agree that in the event this resignation is accepted and I later file a petition for reinstatement, that the Supreme Court will consider in connection therewith all disciplinary matters and proceedings against me at the time this resignation is accepted, in addition to other appropriate matters. I further agree that upon filing of this resignation by the Office of the Clerk, State Bar of California, that I will remain on inactive membership of the State Bar. Because of this I shall be ineligible to practice law . . . . [¶] I further request that . . . due to my resignation from the State Bar that the Supreme Court of the State of California dismiss the proceedings against me. . . ."

This communication, addressed to the State Bar, does not alter our decision to proceed with consideration of the merits for the reasons stated in the text.

[4] Subdivision (c) provides in pertinent part: "On recommendation of the Commission on Judicial Performance the Supreme Court may . . . censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term that constitutes wilful misconduct in office, persistent failure or inability to perform the judge's duties, . . . or conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

known to be beyond his power, (2) for a purpose other than faithful discharge of judicial duties." (*Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 622, fn. 4; accord *Furey* v. *Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1305 [240 Cal.Rptr. 859, 743 P.2d 919].)

■ Prejudicial conduct, or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (art. VI, § 18, subd. (c)), is generally less serious than willful misconduct and may be committed either (1) while acting in other than a judicial capacity or (2) while acting in a judicial capacity but in good faith and without malice. Prejudicial conduct while acting in a judicial capacity means "conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office." (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 284; accord *Ryan* v. *Commission on Judicial Performance* (1988) 45 Cal.3d 518, 530-531 [247 Cal.Rptr. 378, 754 P.2d 724, 76 A.L.R.4th 951].) Prejudicial conduct while *not* acting in a judicial capacity may be committed in bad faith or with malice and thus fall short of willful misconduct only because not committed in a judicial capacity. (*Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d 1297, 1304; *Geiler, supra,* 10 Cal.3d at p. 284, fn. 11.) The provision that prejudicial conduct must be that which "brings the judicial office into disrepute" (art. VI, § 18, subd. (c)) does "not require notoriety, but only that the conduct be 'damaging to the esteem for the judiciary held by members of the public who observed such conduct.' (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 534 [116 Cal.Rptr. 260, 526 P.2d 2681].)" (*Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 622-623, fn. 4.)

■ In considering the commission's report and recommendation, we must independently review the record and sustain the charges against petitioner only to the extent we find there is clear and convincing evidence sufficient to prove them to a reasonable certainty. (*Ryan* v. *Commission on Judicial Performance, supra,* 45 Cal.3d 518, 530; *Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d 1297, 1304.) We must then determine, as a matter of law, what if any constitutional grounds for judicial discipline are established by each of the findings thus sustained and whether those grounds support the commission's recommendation of removal. (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 276.) In formulating these legal conclusions, we give great weight to the conclusions of the commission. (*Ryan, supra,* 45 Cal.3d at p. 530; *Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d at p. 623.) In resolving disputed issues of fact, however, we give special deference to the determina-

tions of the masters, who were best able to evaluate the truthfulness of the witnesses appearing before them. (*Ryan, supra,* 45 Cal.3d at p. 530; *Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d 1297, 1304.) Each of the three masters who heard petitioner's case was a judge or retired judge of the Los Angeles County Superior Court and thus experienced in assessing credibility.[5]

■ Some of the commission's findings expand upon the charges in the amended notice of formal proceedings. We have repeatedly refused to adopt commission determinations of judicial misconduct based on findings outside the scope of a notice of formal proceedings, as amended. (*Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 638-639; *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 696 [122 Cal.Rptr. 778, 537 P.2d 898].) Here, neither the masters nor the commission exercised their power under rule 911 to allow or require further amendments that would have enlarged the scope of the notice to encompass the commission's findings. We therefore consider the findings only for their bearing upon the charges that the amended notice, together with petitioner's answer, placed in issue (see rules 908(a), 912(a)).

### Misconduct in Response to Arrest and Prosecution for Drunk Driving (Counts one, two and three)

The first three counts upheld by the commission pertain to events surrounding the arrest and prosecution of petitioner for driving under the influence of alcohol about 1 a.m. on August 21, 1985. Count one deals with petitioner's alleged efforts to have charges dropped, count two with the arrest itself, and count three with petitioner's conviction on a nolo contendere plea. The commission concluded that its findings pursuant to each of the three counts established prejudicial conduct, and that its findings on count one also established willful misconduct. We consider the counts in chronological order, beginning with count two.

(a) *Rudeness and Noncooperation in Connection With Arrest* (count two)

■ Count two charged that at the time of petitioner's arrest, he failed to cooperate by behaving in a rude and abusive manner toward the arresting officers, refusing to complete field sobriety tests, and refusing to submit to any chemical test of his blood, breath or urine despite the implied consent provisions of the Vehicle Code. The commission found all these charges to

---

[5]The three masters were Judges Parks Stillwell (retired), Max F. Deutz (retired), and Phillip F. Jones.

be true and further found that petitioner refused the chemical tests despite being advised five times about the implied consent provisions. The commission also found that the arresting officers and the officers at the sheriff's substation where petitioner was taken following the arrest observed objective symptoms indicating that he was under the influence of alcohol.

The arrest was made by California Highway Patrol (CHP) Officer Diane Rojas while directing traffic at the scene of an accident on a transition ramp between freeways 605 and 91. Petitioner was driving alone. Rojas testified she noticed that petitioner's car was running over some flares. She gave him three orders to stop before he did so and repeatedly instructed him to extinguish his cigarette, explaining that gasoline had spilled from an overturned vehicle. When he did not comply, she reached in his car and took the cigarette away. Smelling alcohol, she asked him to step outside. Again he did not comply with her repeated requests, so she opened the car door, pulled him out, and attempted to administer field sobriety tests, with which he refused to cooperate. Concluding from his speech, gait, and eyes that he was under the influence of alcohol, she placed him under arrest and advised him of his obligations under the implied consent law to submit to chemical tests for blood alcohol. (See Veh. Code, §§ 13353, 23157.) He repeatedly refused such tests. On the way to the sheriff's substation with Rojas and her partner, petitioner kept saying he couldn't believe he was being arrested by female officers, and that he wasn't drunk. During the booking process he was again uncooperative.

When Rojas and her partner discovered that petitioner's belongings included his business card as a judge, they called CHP Sergeant Bladow and had the jailer call his own supervisor, who was Sheriff's Sergeant Balch. Balch and Bladow both saw petitioner at the substation and corroborated that he was rude, uncooperative, and seemingly under the influence of alcohol. He again refused to take chemical tests, this time offered twice by Bladow. Balch and Bladow concluded that to avoid risks from exposing petitioner, as a judge, to other prisoners, Bladow should drive petitioner home. Bladow did so.

Petitioner testified that he had had no more than three and a half glasses of wine and that he was not uncooperative. He contends the officers' testimony that he was rude and obnoxious should be disbelieved because they did not treat him as physically dangerous. Thus, they took no precautions to restrain him while interviewing him outside the cell or while Bladow drove him home in the front seat of the patrol car. The commission's findings, however, pertain only to noncooperation and verbal abuse, not to physical threats or conduct.

The masters as well as the commission found that petitioner had refused to cooperate with the officers by behaving in a rude and abusive manner and by refusing to complete field sobriety tests or submit to any chemical test. The officers' testimony supporting these findings pursuant to count two is clear and convincing, and we adopt them as our own. We also adopt the commission's conclusion that petitioner's behavior described in the findings constituted prejudicial conduct.

(b) *Attempts to Obtain Preferential Treatment* (count one)

 Count one charges that on August 22, 1985, petitioner went to a CHP office and spoke with Sergeant Bladow about his arrest the previous day. Petitioner allegedly said he "would like to make a deal or something," and asked if the paperwork could get lost between the CHP and the court or if something could be worked out with the captain. It is charged that petitioner abused his authority as a judge to obtain preferential treatment. The masters found these charges to be true, and the commission's findings adopted them in substance.

Bladow testified that when he drove petitioner home from the sheriff's substation, petitioner said he wanted to file a complaint against the CHP officers for making a false arrest and on other grounds. Bladow replied that he would not then accept a complaint because of petitioner's intoxicated state, but that petitioner could call him at his CHP office, for which he left the telephone number.

The next day, August 22, petitioner phoned Bladow and made an appointment to come to Bladow's office that evening. At that meeting, petitioner was polite and apologetic about his actions following his arrest. He asked which court would hear his case. When told it would be the Los Cerritos Municipal Court in Bellflower, petitioner said that would be embarrassing, because people there knew him from his having appeared in that court as a deputy district attorney. He asked if the case could be transferred; Bladow said that would be up to the district attorney's office.

Bladow testified that during this conversation petitioner "made a request that maybe I [Bladow] could lose the paperwork or the paperwork could get lost somewhere between the office and the court." Bladow replied that "we" would not do that. He mentioned certain pending charges against two CHP officers for failing to process paperwork for the court and said he would not jeopardize his job by doing such a thing. Petitioner asked if Bladow's captain could help petitioner or maybe lose the paperwork. Bladow replied that Captain Whiteside "would not under any circumstances be involved in anything like that," but that petitioner was free to speak with him.

Petitioner's version of this incident is that Bladow, when taking petitioner home, initiated the idea of their meeting again to discuss the evening's events "when the smoke settles." Petitioner thought Bladow wanted a further discussion because Bladow was of the opinion that a mistake had been made, and wanted to clarify the matter as soon as possible. When petitioner first arrived at Bladow's office, he noticed a newspaper on the desk carrying a story about two highway patrol officers indicted for bribery in drunk driving cases. They briefly discussed the article; then petitioner asked in which court his case would be filed, and expressed disappointment when told it would be the Los Cerritos court. Bladow agreed to let petitioner see the reports on his case, but then said he could not find them. Finally, petitioner said he thought the CHP officers had made a major mistake in arresting him and asked whether there was any CHP procedure for holding a hearing to discuss the facts of a case. Bladow said he knew of no such procedure, but invited petitioner to discuss the matter with the captain. Petitioner then terminated the conversation. He denied seeking any preferential treatment or any diversion of the papers in his case.

The commission's findings upholding count one are supported by clear and convincing evidence. Petitioner's testimony, that Bladow sought the interview out of embarrassment stemming from a belief that petitioner's arrest had been a big mistake, is not credible. The count one findings are reinforced by the commission's findings on count two that the arresting officers and officers at the jail observed symptoms indicating petitioner was under the influence of alcohol. Those findings are amply supported by testimony and utterly discredit petitioner's version.

A closer question is presented by the commission's conclusion that in this incident petitioner "abused his authority as a judge in an attempt to obtain preferential treatment," and that his behavior constituted willful misconduct in office as well as prejudicial conduct. For purposes of judicial discipline, willful misconduct can be committed only while acting in a judicial capacity. (*Gonzales* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 359, 365; *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 283-284.) The question, therefore, is whether petitioner was acting in a judicial capacity when he asked Sergeant Bladow for preferential treatment at the CHP office on August 22.

In support of its theory of willful misconduct under count one, the commission made an additional finding pertaining to an earlier incident that occurred when Sergeant Bladow was driving petitioner home from the sheriff's substation in the early morning hours of August 21, just after petitioner's arrest. At that time, states the finding, petitioner "referred to his judicial status and told the sergeant to remember that the Highway Patrol

had to come before him when he was on the bench." Bladow testified that this statement was made at the end of the 20-minute ride home, during which petitioner berated CHP personnel for arresting him and not letting him drive his own car home. The remark does not appear to have been accompanied by any request for special treatment. The incident confirmed what undoubtedly was already common knowledge on the part of Bladow and petitioner, that the latter was a municipal court judge before whom CHP officers might appear from time to time as witnesses.

The mere fact of this common knowledge is insufficient to establish that petitioner was acting in a judicial capacity during the conversation in which he made the requests for special treatment. The present case is clearly distinguishable from the two decisions cited by the commission on this issue, in each of which a judge committed misconduct by using the authority of his office for improper ends. Thus, in *Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 794, footnote 14, and 798-799 [119 Cal.Rptr. 841, 532 P.2d 1209], the judge had received a traffic citation and committed willful misconduct by entering the chambers of a fellow judge of the same court and prevailing upon the latter to prepare and sign a dismissal of the citation. In *Gonzales* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 359, 366-369, the judge summoned a deputy district attorney into his chambers and attempted to persuade the latter to dismiss charges in cases not before the judge. Here, in contrast, petitioner made his improper requests in a conversation that took place wholly outside any judicial setting. There is no evidence that he even referred to his judicial status on that occasion.

Accordingly, it has not been proved by clear and convincing evidence that petitioner was acting in a judicial capacity when he sought favorable treatment from Bladow. The conduct of a judge not acting in judicial capacity cannot amount to willful misconduct, for purposes of judicial discipline, regardless of the malice or bad faith involved. (*Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d 1297, 1304; *Gonzales* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 359, 365; *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d, 270, 284, fn. 11.) We therefore hold that by engaging in the acts charged and proved under count one, petitioner committed prejudicial conduct but not willful misconduct.

(c) *Misdemeanor Conviction on Nolo Contendere Plea* (count three; dismissed)

Count three charges that on October 1, 1985, petitioner was "convicted in the Los Cerritos Municipal Court, on a plea of nolo contendere, of

the offense of driving under the influence of alcohol on August 21, 1985." The masters and the commission upheld this charge and found additionally that there was no valid explanation for the nolo contendere plea other than petitioner's guilt. These additional findings must be disregarded in our consideration of this count, however, if the charge itself does not state a ground for discipline. We conclude that it does not.

Article VI, section 18, subdivision (b), of the Constitution provides for removal by this court of a judge who pleads guilty or no contest or is found guilty of a crime that is punishable as a felony or involves moral turpitude. Violation of Vehicle Code section 23152, subdivision (a), the offense of which petitioner was convicted, constitutes only a misdemeanor (Veh. Code, § 40000.15), and there was no finding or showing that petitioner's commission of the offense involved moral turpitude. The question therefore is whether the bare fact of a judge's conviction of a misdemeanor not involving moral turpitude, based on a plea of nolo contendere, can constitute prejudicial conduct warranting discipline.

In *Cartwright* v. *Board of Chiropractic Examiners* (1976) 16 Cal.3d 762 [129 Cal.Rptr. 462, 548 P.2d 1134], we held that the license of a chiropractor who had been convicted on a plea of nolo contendere of violating Penal Code section 316 (prohibiting the keeping of a "disorderly house") could not be revoked for "conviction of a crime involving moral turpitude" (Chiropractic Act, former § 10, subd. (b), 3 West's Ann. Bus. & Prof. Code (1974 ed.) p. 147). Our holding rested not on the statutory prohibition against using a nolo contendere plea as an admission in a civil suit (Pen. Code, former § 1016, subd. 3), but on judicial construction of the nolo contendere plea as the equivalent of a guilty plea for only the purpose of the criminal proceeding. (16 Cal.3d at p. 772; see *In re Hallinan* (1954) 43 Cal.2d 243, 247 [272 P.2d 768]; *Grannis* v. *Board of Medical Examiners* (1971) 19 Cal.App.3d 551, 557-560 [96 Cal.Rptr. 863]; *Kirby* v. *Alcoholic Bev. etc. App. Bd.* (1969) 3 Cal.App.3d 209, 218-222 [83 Cal.Rptr. 89]; *Caminetti* v. *Imperial Mut. L. Ins. Co.* (1943) 59 Cal.App.2d 476, 490-492 [139 P.2d 681].)

The practical impact of the *Cartwright* principle has been substantially narrowed by legislation expanding the legal effect of a nolo contendere plea. Penal Code section 1016, subdivision 3, now provides that the "legal effect of [a nolo contendere] plea, *to a crime punishable as a felony,* shall be the same as that of a plea of guilty *for all purposes.*" (Italics supplied; see also Evid. Code, § 1300.) A number of licensing statutes have been amended to specify a nolo contendere plea, or conviction based thereon, as a ground for discipline. (*Cartwright* v. *Board of Chiropractic Examiners, supra,* 16 Cal.3d at p. 771; *Arneson* v. *Fox* (1980) 28 Cal.3d 440 [170 Cal.Rptr. 778, 621 P.2d

817] [sustaining revocation of license of real estate broker, convicted after nolo contendere plea, under Bus. & Prof. Code, § 10177, subd. (b)].)[6]

The commission recognizes that in the absence of legislation altering the *Cartwright* principle, nolo contendere pleas should be excluded from administrative licensing proceedings, but contends that the rule should be otherwise in judicial disciplinary proceedings. The commission relies extensively upon *Matter of Killam* (1983) 388 Mass. 619 [447 N.E.2d 1233], but there a judge was censured for the *act* of driving under the influence of intoxicating liquor. Here, the commission chose to charge petitioner only with a *conviction* for such misconduct and not with the act itself.

The commission contends that our reliance in *Cartwright v. Board of Chiropractic Examiners, supra,* 16 Cal.3d 762, on the absence of any *legislative* provision for basing discipline on convictions following nolo contendere pleas, makes our holding inapplicable to *constitutionally* based judicial disciplinary proceedings. The Constitution itself, however, expressly provides for judicial discipline based on "no contest" (nolo contendere) pleas only if the plea is to a crime punishable as a felony or involving moral turpitude. (Cal. Const., art. VI, § 18, subd. (b).) The drafters of the constitutional provision seem to have recognized that a nolo contendere plea to a lesser crime may be "induced by factors collateral to the issue of guilt" (*Arneson v. Fox, supra,* 28 Cal.3d 440, 446). Indeed, if a judge considers himself or herself not guilty of a charged misdemeanor or infraction not involving moral turpitude, a nolo contendere plea may well be less "prejudicial to the administration of justice" or less likely to "[bring] the judicial office into disrepute" (art. VI, § 18, subd. (c)) than would the adverse publicity and the expenditure of time and money which would result from a plea of not guilty.

Thus, the sole charge in count three of the amended notice of formal proceedings, that petitioner was convicted, on a plea of nolo contendere, of the offense of driving under the influence of alcohol, fails to state a ground for discipline. Count three is therefore dismissed.

### JUDICIAL RUDENESS AND DENIAL OF DUE PROCESS
#### (Counts four and six)

Count four charges petitioner with demeaning, rude, impatient, and abusive behavior toward individuals appearing before him, and count six

---

[6] In apparent response to the *Cartwright* decision, section 10, subdivision (b), of the Chiropractic Act was amended in 1978 to authorize revocation of a practitioner's license because of "a plea or verdict of guilty or a conviction following a plea of nolo contendere made to a charge of a felony or of any offense substantially related to the practice of chiropractic." (Stats. 1978, ch. 307, § 3, p. 640, approved at Gen. Elec. of Nov. 7, 1978.)

charges him with denying parties or their attorneys the right to be heard. Incidents exemplifying these charges are described in the following paragraphs under count 4. (We omit paragraphs e and g since the charges therein were dismissed by the commission.)

(a) *Taking over questioning and ordering counsel not to return* (par. a; dismissed)

Paragraph a charges: At a preliminary hearing on December 24, 1985, petitioner said to a deputy district attorney during her direct examination of an officer-witness, "I'm going to take this over, counsel. This is ridiculous." When counsel objected to petitioner's questions, petitioner became angry and told her she was "not to come in here again." Paragraph i alleges that at the hearing petitioner intimidated counsel and interrupted and took over questioning.

The masters found that the allegations of paragraph a were factually correct and that petitioner had improperly interrupted and taken over the questioning, but refused to find that petitioner had thereby intimidated counsel, had improperly curtailed questioning, had been demeaning, rude, impatient or abusive to persons appearing before him, or had conducted himself in a manner that reflects adversely on the judiciary. ▮ The commission, on the other hand, dismissed the charge of improperly interrupting and taking over the questioning (par. i), but found that in responding to the deputy district attorney's objections to his questions, petitioner had become angry, sarcastic and abusive, and had thereby committed prejudicial misconduct. The commission also found that petitioner's order to the deputy "not to come in here again" was conduct reflecting adversely on the judiciary and constituted prejudicial conduct.

The commission's finding of impropriety in petitioner's judicial demeanor appears to rest on the deputy district attorney's testimony of her impressions that petitioner had a "fidgety, impatient" mannerism, "spoke in a shrill manner," and addressed her as "ma'am" in a sarcastic tone. The credibility of these impressions could best be judged by the masters, who observed the witness and rejected the charge of impropriety in petitioner's manner.

The commission contends that petitioner's ordering counsel not to return to his courtroom was parallel to the willful misconduct of Judge Wenger in banishing a deputy district attorney from his courtroom. Wenger, however, imposed the ban apparently to prevent the deputy from reporting his conduct to the commission. (*Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 650-652.) Here, the incident arose when the deputy

apparently objected to being addressed as "ma'am," was told by petitioner "not to come in here again," and replied, "Thank you very much. That's a privilege." Petitioner testified that the deputy spoke in a sharp tone and was insolent and disrespectful. Although she thereafter refrained from appearing before petitioner, the masters found it "not true that [petitioner] intimidated counsel." Giving due weight to the masters' assessment of credibility, we conclude that the commission's findings and conclusions of prejudicial conduct in connection with the conduct charged in paragraph a of count four are not supported by clear and convincing evidence. Accordingly, the charges based on that paragraph are dismissed.

(b) *Loud, angry behavior toward counsel in chambers* (par. b)

██ Paragraph b alleges: In the summer of 1985, after a preliminary hearing in a robbery case at which petitioner sharply curtailed direct examination conducted by Deputy District Attorney Barbara Channell, petitioner called Channell into chambers and, without apparent cause, angrily accused her of creating a security hazard in the courtroom. He raised his voice and pointed his finger at Channell, who was astonished and upset. The masters found these allegations to be true and further found that petitioner jokingly referred to the incident later in the day, showing he had acted in bad faith. The commission adopted the substance of the masters' findings. Both the masters and the commission concluded that petitioner's behavior constituted willful misconduct.

Channell testified that she had been instructed to make an extensive record at the preliminary hearing because the victim was frightened and wanted to drop the charges. Petitioner ordered her to cease her examination even though she attempted to explain the situation to him. After holding the defendant to answer, he ordered her into his chambers, where he explained that continued examination of the victim was creating a security risk because of persons in the courtroom connected with the defendant. Petitioner testified that during the examination, the defendant and his friends continuously stared at the victim.

During the in-chambers conference, however, he yelled for three to five minutes, so loudly that a clerk testified she could hear his voice in the courtroom. The clerk saw Channell emerge in tears. Channell testified that she was extremely upset, notified her superiors, and never returned to petitioner's courtroom for any further preliminary hearings. At the time of her testimony in 1987, she had been a deputy district attorney for nine years.

Shortly after the incident, Channell visited the chambers of Judge Lorna Parnell and explained what had happened. Less than an hour later, as Judge

Parnell was leaving the courthouse, she walked past petitioner's chambers, where she saw and heard petitioner laughing and telling his clerk how funny it was that he had upset a deputy district attorney and made her run out of his courtroom. Petitioner testified that he did raise his voice during the meeting with Channell in chambers, but that he had no recollection of later laughing about the matter with the clerk.

Clear and convincing evidence supports the commission's findings that petitioner's behavior, as described in paragraph b of count four, was demeaning, rude, impatient and abusive, and was treated by him as a laughing matter. We also agree that he was acting in a judicial capacity and in bad faith, and that his actions therefore constituted willful misconduct in office as well as prejudicial conduct. We decline, however, to adopt the commission's conclusion that petitioner's curtailment of the deputy district attorney's cross-examination constituted prejudicial conduct consisting of a denial of the right of a party or counsel to be heard (count six, cross-referring to paragraph b of count four). Petitioner's view that he had discretion to curtail the preliminary examination, out of concern for security of the courtroom, once there was sufficient evidence to hold the defendant to answer, "had at least enough merit to prevent the holding of it from constituting misconduct" (*Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 647, fn. 13).

### (c) *Addressing female personnel as "sweetheart"* (par. c)

 Paragraph c of count four alleges that petitioner addressed female attorneys and others appearing before him as "sweetie," "sweetheart," "honey," or "dear." The masters and the commission found this charge was true and that the expressions used were unprofessional, demeaning and unjustified by personal friendship or acquaintance.

Three attorneys, plus a deputy clerk and a police detective, all women, testified that petitioner had addressed them as "sweetheart," "sweetie," or "baby"; three of these witnesses stated that petitioner had also addressed female defendants as "sweetheart" or "sweetie." In his written answer to paragraph c, petitioner acknowledged that he had addressed many female acquaintances and friends, as well as members of his staff or of the clerk's office, as "dear," "honey," or "sweetheart," but asserted each of these was "meant as a warm, friendly word."

The commission found that petitioner had used these expressions in open court, but the masters found he had not done so. There was testimony that petitioner had used the terms "sweetie" or "sweetheart" to "females in the courtroom," but the witness did not specify whether court was then in

session. Thus, the commission's finding on this point lacks the requisite evidentiary support. It can fairly be inferred, however, that petitioner used the expressions in and about the courthouse during business hours to people he knew principally or solely in connection with his judicial duties. We agree with the commission that petitioner's use of these terms in addressing women under those circumstances was unprofessional, demeaning and sexist, and violated canon 3A(3) of the California Code of Judicial Conduct ("Judges should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom judges deal in their official capacity . . . ."). We therefore adopt the conclusions of the masters and the commission that these acts constituted prejudicial conduct.

(d) *Rudeness to criminal litigants* (par. d)

Paragraph d of count four alleges that petitioner was discourteous, impatient, and demeaning to litigants appearing before him in criminal and civil cases. The masters and the commission found this charge true only with respect to criminal cases. The commission's findings state four examples: (1) Petitioner frequently failed to respond to questions from traffic and misdemeanor defendants or to allow such defendants to explain their conduct. (2) Petitioner sometimes interrupted misdemeanor defendants who were attempting to address the court and ordered them remanded, resulting in additional incarceration. (3) Petitioner frequently lost his temper and yelled at litigants, sometimes ordering them out of his courtroom. (4) Often, petitioner used a demeaning tone of voice to Asian-surnamed defendants appearing on fish and game violations and uttered such statements as, "You were catching fishy, fishy in the harbor here and you weren't supposed to? Were you a bad boy?" Petitioner also demeaned defendants who appeared to be alcoholics or transients by addressing them using slurred speech.

The commission's findings are amply supported by the testimony of two deputy district attorneys and two deputy city attorneys, all of whom had appeared frequently in petitioner's courtroom. Petitioner called 28 witnesses, including attorneys, bailiffs, clerks and court reporters, who testified to being frequently present in petitioner's courtroom without observing any of this type of misbehavior. The fact that petitioner proceeded properly and courteously on many, or even most, occasions, however, does not excuse the instances of misconduct proved by testimony which the masters found credible. We adopt the commission's findings on paragraph d of count four, as well as its conclusion that the subject behavior constituted prejudicial conduct. We also agree with the commission that petitioner's refusal to listen to defendants who were attempting to address the court, as found under paragraph d of count four, amounted to prejudicial conduct consisting of the denial of parties' full right to be heard, as charged in count six.

(e) *Abusive screaming at counsel* (par. f)

Paragraph f of count four alleges that petitioner screamed in an abusive manner at Deputy City Attorney Carol Rose (1) in open court when she attempted to make a bail motion and (2) in chambers when she suggested that some of the eleven conflict cases on the afternoon calendar, all assigned to David Pantoja as appointed counsel, be reassigned to other counsel in order to expedite the calendar. The masters found these allegations true, as did the commission. The commission also found that petitioner's yelling at Ms. Rose in open court so intimidated her that she felt she could never make another bail motion before petitioner, and that his yelling at her in chambers frightened her and reduced her to tears.

■■■ The findings are supported by the testimony of Rose, who said that both incidents occurred about 3:30 p.m. on different days between January and August 1985 but that she could not fix any exact dates. As to the second incident, Rose testified that by 3:30 p.m., Pantoja had interviewed only two of the eleven defendants he was scheduled to represent at arraignments that day. She approached a local attorney and ascertained that he would be willing to take some court appointments, then asked Pantoja if he would be willing to split the appointments with that attorney so they could all finish by 5 p.m. Pantoja agreed, and Rose said she would speak to petitioner about it. When she made the request to petitioner, he was furious and accused her of calling Pantoja incompetent.

Petitioner argues these are vague accusations made by a single attorney and contradicted by testimony of petitioner's consistently decorous behavior by numerous witnesses who were in his courtroom on a regular basis. The intemperate behavior found here, however, is consistent with petitioner's similar conduct established by the findings under paragraphs b, d, and h of count four. Moreover, Pantoja is one of the attorneys toward whom petitioner is found, in count five, to have shown favoritism in making appointments. As the commission points out, that fact may have made petitioner overly sensitive to the suggestion that some of those appointments be transferred to another attorney.

The masters concluded that the foregoing behavior, charged in paragraph f, constituted willful misconduct, but the commission decided it was only prejudicial conduct. The evidence does not establish clearly and convincingly that the acts in question were committed for a purpose other than the faithful discharge of judicial duties and thus amounted to more than spontaneous outbursts. In the absence of a showing of bad faith requisite for willful misconduct, we conclude that the findings under paragraph f of count four constituted prejudicial conduct. We also conclude that petition-

er's angry rebuff of counsel's attempt to make a bail motion denied counsel the right to be heard and, as determined by the commission, thereby constituted prejudicial conduct under count six.

(f) *Intimidation of witnesses* (par. h)

■ Paragraph h of count four alleges that petitioner was rude and intimidating to witnesses, unnecessarily interrupted their testimony, at times harshly admonished them to "just answer the question," and caused them to become upset. The masters and the commission found this charge true.

The evidence supporting this charge was the testimony of Judge Lorna Parnell, who testified that her first judicial assignment, from August through December 1985, was in the San Pedro branch where petitioner was also sitting. Because she was new to criminal law, she sat in petitioner's courtroom on three occasions to observe preliminary hearings. She testified that petitioner became loud, impatient, and abusive toward witnesses who hesitated in answering questions. She was concerned about this behavior because most of the witnesses had been victims of crime.

Petitioner contends that this testimony lacks specific case names and dates, and is too vague. The intemperate judicial conduct found here, however, is consistent with other acts of petitioner established by the findings. There was no reason to disbelieve Judge Parnell's testimony. We find the charges of paragraph h of count four to be true and agree with the masters and the commission that the acts charged constituted prejudicial conduct consisting of both rude, intimidating treatment of witnesses (count four) and denials of the right to be heard (count six).

FAVORITISM TOWARD APPOINTED COUNSEL (Count five)

Count five charges that petitioner has "shown favoritism to private attorney Theordore Veganes, with whom [petitioner has] jointly owned property in Hawaii since 1976, and to private attorney David Pantoja by conduct which includes, but is not limited to, the following: . . . ." There follow four paragraphs charging misconduct. Paragraphs c and d were dismissed by the commission; therefore, only paragraphs a and b are considered here.

(a) *Favoritism in appointing counsel for indigent defendants* (par. a)

Paragraph a of count five charges petitioner with exercising his power of appointment on behalf of Attorneys Veganes and Pantoja in an extremely high number of cases during the years 1983 to 1986. The masters found that this charge was true and constituted prejudicial conduct.

The commission found favoritism not only toward Attorneys Veganes and Pantoja, as charged in count five, but also toward a third attorney, "Susan Anderson, an associate of Mr. Pantoja," and found under paragraph a that petitioner had overly used his appointive power on behalf of all three attorneys. The commission then made four subfindings, which we must consider for their bearing on paragraph a's charge of favoritism toward Attorneys Veganes and Pantoja. The first two of these subfindings are based on testimony and documents presented to the masters by an internal auditor for the Los Angeles County Controller's Audit Division, who had been directed to audit appointments of attorneys under Penal Code section 987.2 from the beginning of 1984 to March 1987 in the San Pedro courthouse, to which petitioner was assigned in January 1985.[7]

The first of the 2 subfindings is that from January 1986 to March 1987, petitioner appointed Attorneys Veganes, Pantoja, and Anderson to serve in 465 (approximately 58 percent) of the 801 cases in which he made appointments. The auditor also testified, however, that the 3 attorneys received 99 of 484 appointments made by judges other than petitioner during that period. Moreover, there was no testimony on how many of these appointments went to Anderson, who was specified as one of the recipients of favoritism in the commission's findings but not in the amended notice of formal proceedings.

The second subfinding was that in 1985 the three allegedly favored attorneys received 30.3 percent of all the money paid for appointments in the San Pedro courthouse, whereas in 1984 only 4.8 percent of such payments went to Veganes and none to the other two attorneys. The auditor, who testified to these figures, also stated that of the 30.3 percent of the payments in 1985, 6.8 percent went to Anderson, 7.2 percent to Pantoja, and 16.3 percent to Veganes. He did not say how many of these appointments were made by petitioner and how many by other judges. Moreover, the auditor testified that because attorneys usually did not submit their claims for two or three months, or sometimes even six months, there was no way of knowing how many of the payments in 1985 were for services performed in 1984, i.e., before petitioner took the bench in San Pedro. Veganes testified that it was his regular practice to allow requests for payment for services as appointed counsel to accumulate for three or four months and then submit them in one batch.

Petitioner's clerk testified that when appointments were necessary because the public defender was unavailable or declared a conflict, petitioner

---

[7]Though the audit extended to March 1987, our finding under count eight, paragraph b, establishes that petitioner did not work at all after the beginning of 1987.

would have her check the building for available attorneys, and if she could not find one she would make telephone calls to attorneys who had asked to be placed on the appointments list. She named nine attorneys (including the three in question) who were repeatedly appointed, and she denied that petitioner had ever told her to call only Veganes, Pantoja, and Anderson.

Five attorneys, other than those three, testified to receiving as many San Pedro appointments as they could handle. Both a deputy district attorney and a deputy city attorney, however, testified that after petitioner's arrival at the court, most (one said 90 percent) of the appointments went to Veganes, Pantoja, and Anderson. Petitioner testified that he frequently appointed Veganes and Pantoja because of their competence but that he did not keep track of how often he used them. He had served with both men in the same district attorney's office, and both testified that they contributed to petitioner's 1986 judicial reelection campaign.

Judge Trammell, who was presiding judge of the Los Angeles Municipal Court, testified that a directive had been sent by his predecessor to judges of the court pertaining to appointment of counsel. The directive, which is in evidence and dated July 31, 1985, states that its provisions for "appointment rotation via a list of eligible attorneys" is "not in effect at this time." Judge Trammell also testified that on several occasions he advised petitioner that he had discussed appointments of counsel with a county auditor and had received telephone calls on the subject from a newspaper reporter, and that he was concerned about the issue. Petitioner replied that he felt there were a number of people who were out to get him.

The commission's third subfinding under paragraph a of count five was that petitioner "never disclosed his joint ownership of property with Mr. Veganes to opposing counsel in cases before him in which Mr. Veganes represented defendants." The property in question was a condominium in Hawaii on which petitioner had always paid his share of the expenses. The commission contends the joint ownership violated the canon 5C(1) of the California Code of Judicial Conduct, admonishing judges to "refrain from financial and business dealings that tend to . . . involve them in frequent transactions with lawyers or persons likely to come before the courts on which they serve." Petitioner concedes that his failure to disclose his interest in the property to counsel opposing Mr. Veganes may have given the appearance of some impropriety.

Finally, the fourth subfinding is that "[w]hile assigned to the municipal court on Bauchet Street in Los Angeles, [petitioner] made Penal Code section 987.2 appointments to Mr. Pantoja in order to help Mr. Pantoja reestablish his private practice of law." The finding is based on a single

"yes" answer by petitioner on cross-examination, in response to a question whether he had done what the finding states. There is no other evidence of favoritism toward Pantoja at that time, which preceded petitioner's assignment to San Pedro.

▮ Both the masters and the commission concluded that petitioner had committed prejudicial conduct by favoring Veganes and Pantoja in his appointments of counsel. Giving due weight to the masters' assessment of credibility, we think this conclusion is supported by clear and convincing evidence. Though some of the evidence of favoritism, as already explained, lumped appointments of Veganes and Pantoja with the appointments of Anderson, the fact that Anderson was Pantoja's associate made Anderson's appointments somewhat probative of favoritism toward Pantoja.

The commission also concluded, however, that petitioner's favoritism in appointing counsel constituted willful misconduct. The commission relies for this conclusion on *Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, contending that that decision is directly in point. It is not. Judge Spruance committed willful misconduct by making "illegal and unjustified appointments of two attorneys" who were his friends and supporters. (*Id.* at p. 799.) "[N]o valid reason, such as conflict of interest, existed to justify [the 27] appointments [in question], nor does it appear that in each of the 27 cases a determination of the indigency of these defendants had been duly made as required by Government Code section 27707. [The attorneys] were compensated by Alameda County public funds in amounts not less than $150 for each court appearance without regard to the nature of the service performed or the time expended . . . ." (*Id.* at p. 795, fn. 15.) In the present case, by contrast, there is no contention or evidence that any of petitioner's appointments of the allegedly favored attorneys was not fully justified under Penal Code section 987.2 and related sections, or that the attorneys were overpaid for their services.

Nor do we find any other clear and convincing evidence that petitioner acted in bad faith, i.e., that he knew or should have known the appointments were beyond his powers and that he made them for a purpose other than the faithful discharge of his judicial duties (see *Gubler* v. *Commission on Judicial Performance* (1984) 37 Cal.3d 27, 45-46 [207 Cal.Rptr. 171, 688 P.2d 551]). There is evidence that petitioner was not given clear guidelines for allocating the appointments, and that he acted to provide competent counsel whenever needed without conscious favoritism. Though there was other evidence from which inferences of bad faith might be drawn, such evidence appears to have been rejected by the masters, who were best able to judge credibility. We therefore conclude that the conduct charged in para-

graph a of count five constituted prejudicial conduct but not willful misconduct.

(b) *Ex parte conversations with attorneys who were appearing on appointed cases* (par. b)

As a further instance of alleged favoritism toward Attorneys Veganes and Pantoja, paragraph b of count five charges petitioner with having "[e]x parte conversations in your chambers with these two attorneys on a number of occasions when they were appearing on appointed cases." Petitioner testified that these attorneys sometimes came into his chambers for social visits on days when they were appearing before him in court, but he denied that they ever discussed cases in which he was acting as judge.

■■■ The masters' findings under paragraph b are consistent with petitioner's testimony. The masters found it not true that petitioner had ex parte conversations with the attorneys concerning cases on which they were appearing before him. The masters also found that petitioner "met privately with these attorneys in chambers on days when the attorneys were appearing before [him] as counsel in a case on his calendar, thereby giving the appearance of impropriety." The masters concluded this was prejudicial conduct.

The commission, however, found that during some of the meetings described in the masters' findings, petitioner "would improperly discuss cases in which the attorneys were appearing before him." The principal evidence supporting this finding was the testimony of Carol Rose, who had appeared before petitioner in San Pedro both as a deputy city attorney and as a deputy district attorney. Ms. Rose testified that on four or five occasions she saw Veganes, Anderson, or other defense counsel in chambers without a prosecutor present. She thereupon positioned herself at the chambers door, heard that they were discussing one of her own cases, and then went into chambers herself. Deputy City Attorney Sherry Tourino testified that in cases in which Veganes, Pantoja, or Anderson appeared before petitioner, she saw him invite the attorney into his chambers during the recess. She disclaimed any charge of actual impropriety but said it gave her "a feeling of impropriety."

Mr. Pantoja testified that he frequently visited petitioner in chambers during the lunch period, perhaps twice a week, and that most of the time they were alone. When asked whether during those visits he ever discussed cases in which petitioner had appointed him as counsel, he answered, "Yes." While supportive of the commission's finding, this testimony is literally consistent with the masters' finding that petitioner had no ex parte

conversations with the attorneys concerning cases "in which they were appearing" before him. Pantoja's answer could have referred to cases already finally disposed of by the court. Although the question is close, we defer to the masters' determinations of credibility and adopt their finding that petitioner had no ex parte conversations with attorneys about cases in which they were appearing before him. We conclude, however, that petitioner's practice of meeting alone in chambers with an attorney representing one side of a case pending before him in the absence of circumstances that would make ex parte communication proper (see, e.g., 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, §§ 42-44) gave rise to an appearance of impropriety. It therefore constituted prejudicial conduct "that brings the judicial office into disrepute" (art. VI, § 18, subd. (c)).

### IMPROPER SUGGESTION TO WAITRESS NOT TO WORRY ABOUT DRUNK DRIVING ARREST (Count seven)

Count seven alleges that on the evening of February 22, 1985, petitioner "sat at a bar in Cigo's Restaurant in San Pedro for a period of several hours and during that period engaged in a conversation with Mary Davis, a waitress at the restaurant, in which [he] *repeatedly* implied that she should not worry about her recent arrest for drunk driving *because [he] could in some manner exert influence to affect the disposition of the case*." (Italics added.) The masters found this allegation to be true and concluded that it amounted to willful misconduct. The commission's finding, however, adopted the allegation *except for* the italicized portions; thus, the commission declined to find that petitioner either (1) implied *more than once* that Davis should not worry about her arrest or (2) implied that he could exert influence on her behalf. The commission nonetheless concluded that the conduct described in its finding constituted prejudicial conduct.

Notwithstanding this limited scope of the commission's finding, the commission's brief in this court analyzes at length certain testimony from which it might be inferred that petitioner made repeated offers of improper assistance in the matter. None of that testimony is properly before us. ▆▆▆ It is settled that we "predicate our adoption, modification, or rejection of the Commission's recommendation [to remove petitioner from his judicial office] solely upon those specifications in the [Amended] Notice of Formal Proceedings which the Commission found both to have been proven as a matter of fact and to have constituted constitutionally sufficient grounds for the imposition of discipline." (*Spruance v. Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 785, fn. 5.) Thus, on count seven, we are concerned factually only with the commission's finding that during his long conversation with the waitress, petitioner implied that she should not worry about her recent arrest for drunk driving.

Petitioner testified that he recalled sitting at the bar named in count seven, next to a woman who told him about a drinking-and-driving offense. Though he could not identify the woman as Mary Davis, he was convinced from the testimony that she was the one. He did not comment on, and thus did not deny, the testimony that she was told he was a judge. He testified that he "spoke to her in terms of telling her not to worry about it; it is going to be all right; these things have a way of working themselves out." He said he had often spoken in those terms as he listened to people's problems, including "the facts of . . . their traffic cases and their drinking and driving cases." But he emphatically denied ever telling Mary Davis or anyone else that he would take care of that person's case or use any improper influence in the matter.

Petitioner concedes in his brief that in acting as he testified, he "may have acted inappropriately," and that "[a]t the worst, the evidence might give an appearance of possible impropriety meeting the standard of prejudicial conduct." We agree that for a judge to give a layperson assurances about the outcome of a prosecution against the latter may imply inside information and thus be inappropriate. We concur in the commission's conclusion that petitioner's conduct charged and found true by the commission under count seven constituted prejudicial conduct.

PERSISTENT FAILURE TO PERFORM DUTIES (Count eight)

Count eight alleges that petitioner "persistently failed to perform [his] judicial duties by being frequently absent from the courthouse, maintaining abbreviated working hours and delegating [his] judicial responsibilities to others," and that "this conduct rendered [him] unavailable for judicial services, placed a burden on [his] judicial colleagues, injured the administration of justice, and failed to promote public confidence in the integrity of the judiciary. This conduct is exemplified by, but not limited to, the following:" There follow two paragraphs, of which paragraph a deals with abbreviated working hours, and paragraph b deals with days absent from work.

The masters rejected paragraph a (abbreviated work hours) as not proved, but found that paragraph b (days absent) was true and accordingly upheld count eight only to the extent of its finding on paragraph b. The commission, however, made findings incorporating the substance of both paragraphs and sustaining the whole of count eight.

(a) *Abbreviated working hours* (par. a; dismissed)

Paragraph a of count eight alleged that petitioner had "maintained abbreviated working hours, beginning work at 10:00 or 10:30 a.m., taking

lunch breaks of two to three hours and often stopping work at 4:00 p.m. or earlier." The commission, but not the masters, found this paragraph to be true.

Numerous attorneys and other witnesses testified that petitioner customarily did not take the bench until after 10 a.m., and some said he usually did not arrive at the courthouse until that hour. Petitioner himself testified that his "work hours" were "10 o'clock to noon and from 2 to—I suppose 5 o'clock basically," but that "in most instances" he did not leave the court until 6 or 7 o'clock in the evening because he had things to take care of that he could not get done during the day. He said that he sometimes was there on weekends. He also testified that he usually did not leave for lunch "until probably 12:30 or 1 o'clock" and that he "was back by quarter to 2 or so."

Elaine Markulis, one of petitioner's two courtroom deputy clerks, testified that petitioner usually arrived between 9:30 and 10 a.m. and was still there when she left between 6 and 6:30. The only witness who contradicted petitioner's statement of when he usually left for the day was Judge Parnell, who was at the San Pedro court from July through December 1985. She testified that she "share[d] the same corridor" with petitioner in the "small courthouse" and parked in the same area as he, that she was usually at the courthouse from 9 a.m. to 5 p.m., and that petitioner rarely arrived before 10 a.m. and usually, but not always, was gone when she left at 5 p.m.

Deputy Clerk Markulis explained that petitioner's division handled traffic, misdemeanor and felony arraignments, preliminary hearings, and small claims. She said she arrived at 8:30 a.m., and the courtroom doors were opened at 9 a.m., when the clerks would proceed to call the calendar, find out which defendants were present and which ones needed counsel, and "play a tape of the constitutional rights." Walk-in traffic-ticket arraignments would "come from the office" about 9:50 a.m. Thus, the morning calendar was not ready until 10 a.m. Petitioner's other deputy courtroom clerk, Kathleen McGee, on the other hand, testified that the traffic citations were ready to be heard by 9:15 a.m. The commission argues that petitioner could have heard these traffic citations as well as small claims cases before 10 a.m.

Markulis testified, however, that when petitioner was not on the bench, he was usually in his chambers busy with paperwork, including probation and sentencing reports, small claims cases (which he customarily took under submission), and applications for appointment or compensation of counsel. The commission contends, based on testimony of petitioner's friends, that he spent too much time in chambers socializing instead of working.

Markulis estimated that from 175 to 225 cases per day were dealt with in petitioner's courtroom. Her estimates included: traffic ticket appearances, 20 to 40 in the morning and 20 to 40 in the afternoon; "custodies" (misdemeanor), from 15 to 40 or 45; felony preliminary hearings, 4 to 10, averaging 6 or 7; felony arraignments, up to 4 or 5; and misdemeanor "bailouts," 20 to 40. In addition, there were cases "continued for arraignments." Markulis testified that petitioner always completed his calendar for the day, and Deputy District Attorney Rose testified that when there was a heavy preliminary hearing calendar, petitioner would sometimes go as late as 6 or 7 p.m.

The commission argues that some of petitioner's rude and impatient behavior found under count four may have been due to his failure to allow more time for court proceedings. The commission also asserts that this failure was the cause of petitioner's alleged policy, testified to by Deputy Clerk McGee, as well as by a deputy district attorney, of transferring to downtown Los Angeles any preliminary hearing estimated to last more than one hour. Markulis, however, emphatically denied the existence of any such policy.

Thus, the evidence on paragraph a's charge of abbreviated working hours included numerous conflicts of testimony that the masters who observed the witnesses were in a better position to resolve than the commission. Accepting the masters' resolution, reflected in their finding that rejected paragraph a, we conclude there is a lack of clear and convincing evidence that petitioner maintained abbreviated working hours and thereby shirked his judicial responsibilities. We therefore dismiss paragraph a of count eight.

(b) *Absences from work* (par. b)

Paragraph b of count eight charges that petitioner "did not work approximately ninety-six and one-half days between March 8, 1985 and December 31, 1986; [petitioner] reported inability to work for health reasons on 21 of those days. [Petitioner] apparently ha[s] stopped working and [is] not working in 1987." This charge was found true by the masters and the commission, who also found "[t]here was no legal justification for [petitioner's] failure to work as such during 1987," and concluded that the conduct charged in paragraph b constituted persistent failure or inability to perform judicial duties.

Daily work sheets were introduced before the masters to prove petitioner's absence for 96½ days from March 1985 through 1986.[8] Petitioner testified that during that period he was absent only 95 days, of which 57 days were vacation at the recommended rate of 21 days per year—42 days for 1985 and 1986 plus 15 days carried over from 1984. He also said that during the same period he was sick on 27 days, not just the 21 days stated in the charge. He acknowledged that his figures left 11 days of absence unaccounted for. The commission contends this testimony is inconsistent with the statement in petitioner's answer to the amended notice of formal proceedings that he had not kept records of his vacation or sick time. He testified, however, that his testimony was based on old calendars on which he had noted the dates of his illnesses and his vacations.

Petitioner also testified that since January 5, 1987 (a Monday), he had not worked and had not been available for assignment. He named a doctor who was treating him for "blood pressure," a psychiatrist whom he had been seeing since the fall of 1986, and a psychologist he had consulted before that, but he introduced no expert testimony or reports concerning any limitations imposed by his health upon his ability to carry out his judicial duties. The presiding judge of the municipal court testified that he had planned to transfer petitioner away from San Pedro as of the first of January 1987, but did not do so because in mid-December 1986 petitioner said he was leaving on a vacation for the remainder of the month and thereafter would be taking a medical leave of absence on the advice of his physician.

Based on the foregoing, we agree with the masters and the commission that there is clear and convincing evidence to support the charges of paragraph b, and we so find. Even if a substantial portion of the absences in 1985 and 1986 were excusable by illness or as vacation, there appears no excuse for petitioner's failure to work from the beginning of 1987 to May 14, 1987, the date of his testimony before the masters. Nor does he claim to have made even an attempt to return to his duties from that time until his retirement in July 1988.

The masters and the commission also concluded that the conduct charged and found true under paragraph b constitutes a persistent failure or inability by petitioner to perform his judicial duties. This conclusion is clearly correct, particularly in view of the constitutional history of the elimination of willfulness as an element of this ground for removal.

---

[8] The commission's brief in this court describes testimony of three witnesses to the effect that petitioner failed to provide adequate advance notice of some of his absences. Any such testimony is beyond the scope of the charges against petitioner and therefore must be disregarded. It should not have been referred to in the brief.

From 1960 to 1976 judges could be removed for *"willful and persistent failure* to perform [the judge's] duties." (Italics added; Cal. Const., former art. VI, § 10b [adopted Nov. 8, 1960]; Cal. Const., former art. VI, § 18, subd. (c) [adopted Nov. 8, 1966].) In 1976 such removal became authorized for *"persistent failure or inability* to perform the judge's duties." (Italics added; art. VI, § 18, subd. (c).) The ballot pamphlet argument in favor of the 1976 amendment (Gen. Elec., Nov. 2, 1976) stated at page 31: "Proposition 7 will expand the powers of the Commission to deal with judicial officers who, due to disability, are no longer able to perform their judicial functions. Under current constitutional authority the Commission may only censure or remove a judge where the persistent failure to perform duties is willful. This Proposition will eliminate willfulness as grounds for removal and censure, enabling the Commission to more adequately deal with problems of age and health which may impede the efficiency and quality of justice." No argument against the amendment appeared in the ballot pamphlet.

Accordingly, we conclude that petitioner's excessive absences from work in 1985 and 1986 and his cessation of work altogether at the beginning of 1987, as set forth in our finding on paragraph b of count eight, constituted persistent failure or inability to perform his judicial duties.

### REMOVAL FROM OFFICE

The commission recommends that petitioner be removed from office. For the reasons heretofore explained, we must decide whether to adopt this recommendation even though petitioner voluntarily retired after it was made. The commission based its recommendation on three of the constitutional grounds for removal stated in article VI, section 18, subdivision (c): willful misconduct, prejudicial conduct, and persistent inability or failure to perform judicial duties. We begin by considering whether removal is called for on the first two of those grounds.

(a) *Willful misconduct and prejudicial conduct as ground for removal*

 There is merit in petitioner's contention that our findings of his willful misconduct and prejudicial conduct are insufficient to warrant removal even though they clearly support the lesser discipline of censure.[9] Indeed, our findings against petitioner are similar in degree of gravity to those in two relatively recent cases in which only censure was imposed:

---

[9] The commission's recommendation of removal empowers this court to impose the lesser discipline of censure. (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512 [116 Cal.Rptr. 260, 526 P.2d 268].)

*Gubler* v. *Commission on Judicial Performance, supra,* 37 Cal.3d 27, and *Roberts* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 739 [190 Cal.Rptr. 910, 661 P.2d 1064].

In *Gubler, supra,* 37 Cal.3d 27, the judge made a variety of orders violative of statutory restrictions on enforcement of a defendant's obligation to pay the county for services of the public defender (Pen. Code, § 987.8). The orders unlawfully required defendants to appear for fee-collecting purposes, made fee payments an apparent condition of probation, extracted fees from deposits for bail and, in one instance found to be willful misconduct, doubled a fee because of the judge's irritation over counsel's objection to the fee's being made an apparent condition of probation. Judge Gubler also committed willful misconduct by writing a note to a court commissioner recommending disposition of a case in which the judge had been peremptorily disqualified (Code Civ. Proc., § 170.6). Finally, the judge on four occasions illegally released confiscated guns for sale to his courtroom bailiff, who was a close personal friend, or to purchasers brought in by the bailiff. (See Pen. Code, § 12028.)

In *Roberts* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 739, we held that an independent basis for our censure order was afforded by the judge's conviction (after jury trial) for obstructing a public officer (Pen. Code, § 148) under circumstances reminiscent of the present case. Uniformed officers stopped a car being driven erratically by the judge's son and began to give the son a field sobriety test. The judge emerged from the car, told the officers they had no business stopping the car, directed obscenities at them, handed them a card identifying himself as a judge, and finally struck an officer in the chest and grabbed his shirt. Another independent basis for the *Roberts* censure order was a matter in which the judge threatened a district attorney who had sought a writ against his ruling; advised the public defender, ex parte, "'You'd better win this or I won't grant another motion for you'"; and then, after the Court of Appeal had granted the writ, telephoned the presiding justice before expiration of the time for rehearing, angrily protesting the decision. In another matter, involving child neglect, the judge "'improperly acted as an advocate, prejudged issues, abusively curtailed the presentation of evidence, and treated witnesses, litigants and an attorney in a rude, intimidating and demeaning manner.'" (33 Cal.3d at p. 744.) Moreover, after making his ruling, the judge threatened to report losing counsel to the State Bar if she advised her client to appeal, and then after the appeal was taken made an ex parte request to substituted counsel to consider dismissing the appeal. Finally, during a felony trial, the judge called inexperienced defense counsel into chambers

and caused her to cry by loudly and angrily accusing her of being incompetent and quizzing her about her legal experience.

Petitioner's willful misconduct and prejudicial conduct, though egregious, is not significantly more so than the misdeeds found in *Roberts* and *Gubler.* Like Judge Roberts, he failed to cooperate with officers engaged in enforcing the law against driving under the influence of alcohol, and then attempted to obtain special treatment. On the other hand, petitioner's request that the CHP "lose the paperwork" on his case, though thoroughly reprehensible, did not go beyond the stage of inquiry; aside from his remark the previous evening that CHP officers occasionally appeared before him, he did not press his request with any threat or offer of favors.

Like Judges Roberts and Gubler, petitioner from time to time was demeaning, rude, impatient, and abusive to individuals appearing before him. These included witnesses, as well as traffic and misdemeanor defendants. He sometimes addressed women in the courthouse (though not in open court) with undue and demeaning familiarity. Twice, he yelled at and unjustly intimidated a deputy city attorney, and on another occasion he imparted similar treatment to a deputy district attorney and then was heard to express amusement that he had upset her.

Petitioner also exercised favoritism toward two friends in his appointments of counsel for indigent defendants, but we have concluded that this favoritism was not willful misconduct because petitioner made the appointments under pressure and without adequate guidelines for assuring impartiality among would-be appointees. His visits in chambers with the two favored attorneys while they had cases pending before him gave the appearance of impropriety even though the conversations were not about those cases. (It should be noted that Judge Gubler also exercised favoritism by illegally releasing confiscated guns for sale to or through his bailiff, a close friend. (37 Cal.3d at pp. 55-59.) Finally, petitioner gave the appearance of impropriety when he assured a waitress that she should not worry about her recent arrest for drunk driving.

All this judicial misbehavior by petitioner, though deplorable and clearly calling for censure, falls significantly short of the showings of willful misconduct and prejudicial conduct on which we have based orders removing judges. In *Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d 1297, we removed a judge after sustaining eight charges of willful misconduct arising out of four incidents, plus ten charges of prejudicial conduct; the charges included abuses of the contempt power and an attempt

to influence a case in which the judge had been disqualified. In that opinion, we reviewed five previous cases of judicial removal. (43 Cal.3d at p. 1318.)

Since then, three other judges have been removed. In one of those cases, the judge repeatedly abused his contempt power, personally embroiled himself in cases by ex parte communication or investigation, and regularly left the courthouse at 2 p.m., or even in the morning on Fridays. (*Ryan* v. *Commission on Judicial Performance* (1988) 45 Cal.3d 518 [247 Cal.Rptr. 378, 754 P.2d 724, 76 A.L.R.4th 951].) In a second case, the judge directed a guilty verdict, dismissed a criminal action against a lifelong friend whom the judge had failed even to arraign, ordered criminal trials to proceed in the absence of defense counsel, and failed to sign a judgment even after this court had formally censured him for failing to do so. (*McCullough* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 186 [260 Cal.Rptr. 557, 776 P.2d 259].) Finally, in the third case, removal was based on twenty-five findings of willful misconduct or prejudicial misconduct, including the following: ten incidents of prejudicial conduct over a four-year period reflecting a persistent pattern of rude, abusive behavior toward litigants, witnesses, counsel, and court personnel; abdication on five occasions of the judge's responsibility to ensure the rights of criminal defendants; five instances of abuse of the contempt power; three cases of the judge's personal involvement and failure to remain objective in matters before him; and two instances of abuse of the power to make fee orders. (*Kloepfer* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 826 [264 Cal.Rptr. 100, 782 P.2d 239].)

Petitioner's willful misconduct and prejudicial conduct, though clearly calling for severe censure, was significantly less blameworthy than the misconduct in the removal cases. His inquiries whether the CHP could "lose the paperwork" on his arrest were reprehensible, yet he took no further steps to avoid being prosecuted. (Compare this with the repeated obstruction of criminal prosecution found in *Gonzales* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 359, 366-369, and *Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 794, fn. 14, 798-799.) His rude and demeaning behavior toward litigants, witnesses, and counsel who appeared before him undoubtedly had adverse effects on the proper disposition of cases, particularly where it improperly curtailed testimony or the functioning of counsel. Yet petitioner did not abuse the contempt power, attempt to influence the disposition of cases through ex parte communication or investigation, or intervene in cases in which he had been disqualified. (Cf., e.g., *Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 653.) As for his too frequent appointments of two close personal friends, and the associate of one of them, as counsel for indigent defendants,

we should not assume that if clear guidelines for rotating appointments had been laid down, petitioner would not have followed them.

The testimony of the numerous attorneys and court personnel who testified on petitioner's behalf, particularly in connection with count four, indicates that he was capable of being a competent, conscientious, and fair judge. Viewed as a whole, petitioner's misconduct does not appear so continuing or pervasive as to preclude his reform. (Cf. *Kloepfer v. Commission on Judicial Performance, supra,* 49 Cal.3d 826, 866). Thus, it seems likely that our public censure of each of petitioner's misdeeds would have led him to correct and improve his judicial behavior. (See *In re Rasmussen* (1987) 43 Cal.3d 536, 538 [236 Cal.Rptr. 152, 734 P.2d 988].) Accordingly, we decline to order him removed from office for willful misconduct or prejudicial conduct.

(b) *Persistent failure or inability to perform duties as ground for removal*

■ The commission's recommendation of removal from office is grounded not only on petitioner's willful misconduct and prejudicial conduct, but also on his persistent failure or inability to perform judicial duties, based on the commission's finding, which we have adopted, under paragraph b of count eight. Petitioner's failure to work since the beginning of 1987 without any explanation other than vague references to current medical treatment, and without any evidence that he might or could resume his duties thereafter, is alone sufficient to establish this ground for his removal.

Petitioner asks us to take judicial notice of a writ proceeding concerning his application to the commission for disability retirement in March 1987, two months prior to the hearing before the masters. (See Gov. Code, § 75060 et seq.) He does not claim, however, that the application or the proceeding resulted in any administrative or judicial determination with respect to his ability to work. Hence, the proceeding in question appears irrelevant.

On November 17, 1987, petitioner requested that the commission consider certain exhibits, including six medical reports, at its hearing in this matter then set for December 4, 1987. He did not, however, request a hearing for the taking of additional evidence under rule 916. In objecting to the request on various grounds, the examiners pointed out that even if an evidentiary hearing were ordered, the medical reports would be excludable as hearsay under rule 909, which at that time allowed only "legal" evidence

to be received. The commission, however, adopted a resolution, concurrently with its findings, conclusions and recommendation, that the medical reports offered by petitioner, "although technically inadmissible, have nevertheless been considered by the Commission for the purposes of mitigation." Thus, the commission appears to have considered the reports as in the nature of an offer of proof and to have concluded that even if they were true they would not alter the recommendation of removal.

Five of the reports were addressed to petitioner's counsel; one of these was from a psychologist, dated October 13, 1986, and four were from a psychiatrist, with dates in January, August, September and October 1987. The other report, dated May 7, 1987, was from a different psychiatrist and addressed to the commission. All stated that petitioner had numerous symptoms from stress associated with a hard-fought campaign, beginning in February 1986, to be retained in office at the June 1986 election. Petitioner was said to be suffering from severe depression and numerous related difficulties that would interfere with his functioning as a judge. Thus, the reports, at most, merely confirmed the conclusion that since the beginning of 1987, petitioner had been unable to perform his judicial duties.

Nor would the medical reports, if proved true, affect any of our findings under the other counts. Since petitioner's reported medical difficulties did not commence until February 1986, they could have no bearing on any of the findings that occurred in 1985, i.e., our sole finding of willful misconduct (count four, par. b) and five of our findings of prejudicial conduct (counts one, two, and seven; pars. f and h of count four [included also in count six]).

The remaining counts of prejudicial conduct were either undated (count four, pars. d [included in count six] and c) or took place both before and after February 1986 (count five). But even as to misconduct committed after commencement of the troubles described in the medical reports, proof of the substance of those reports would not be a defense. Protection of the public and of the integrity of the judiciary precludes allowing petitioner's reported physical or emotional difficulties to bar a determination of "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (Art. VI, § 18, subd. (c); see *Matter of Yaccarino, supra,* 101 N.J. 337 [502 A.2d 3, 30].)

CONCLUSION

For the reasons stated, we order that as of the date this decision becomes final, David M. Kennick shall be removed from his office as judge of the Municipal Court for the Los Angeles Judicial District on the sole ground of

persistent failure or inability to perform his judicial duties. We also censure him for his willful misconduct in office and his conduct prejudicial to the administration of justice as determined in this opinion. He shall be permitted to practice law upon passing the Professional Responsibility Examination required of applicants seeking readmission or reinstatement to the bar. (*Gonzales* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 359, 378.)[10]

---

[10]Since petitioner Kennick's retirement has already terminated his tenure in office, the effects of our directing his removal are (1) to establish his ineligibility for judicial office generally and (2) to suspend him from practicing law in California pending further order of this court, thereby laying the foundation for the conditional permission to practice granted by our order. (See Cal. Const., art. VI, § 18, subd. (d).)