*CJP Supp. 231 Opinion
PICHON, Chairperson.
This disciplinary matter concerns Judge Michael E. Platt, a judge of the San Joaquin County Superior Court. Judge Platt was charged with four counts of ticket fixing, three counts of attempting to influence other jurists, and one count of improperly issuing a stay in a detainer proceeding.
The Commission on Judicial Performance finds that the four charges of ticket fixing and three charges of attempting to influence other jurists are supported by clear and convincing evidence. The commission concludes that Judge Platt’s actions on four separate traffic tickets and on one of his attempts to influence another jurist constitute acts of willful misconduct under article VI, section 18, subdivision (d) of the California Constitution. For the reasons set forth in this decision, the commission hereby removes Judge Michael E. Platt from the bench.
PROCEDURAL HISTORY
Judge Platt was appointed to the San Joaquin County Superior Court in September 1994. On October 27, 1997, the commission sent Judge Platt a notice of intended public admonishment for soliciting fundraising contributions from attorneys and court staff. On November 4, 1997, Judge Platt sent the commission a letter accepting the private admonishment and assuring the commission that he would conduct himself and his affairs in compliance with the California Code of Judicial Ethics.
In May 2001, the commission sent a preliminary investigation letter to Judge Platt. Following his response, a second preliminary investigation letter *CJP Supp. 232 was sent to Judge Platt in June 2001. After considering his response, the commission, on August 31, 2001, issued a notice of formal proceedings. Judge Platt filed his answer on September 18, 2001.
On October 16, 2001, the commission sent another preliminary investigation letter to Judge Platt, to which he responded on November 1, 2001. The commission issued a first amended notice of formal proceedings and Judge Platt filed his answer on December 19, 2001.
Meanwhile on October 16, 2001, the Supreme Court, at the commission’s request, appointed Justice Arthur G. Scotland of the Court of Appeal, Third Appellate District (presiding), Judge Jamie A. Jacobs-May of the Superior Court of Santa Clara County, and Judge Peter L. Spinetta of the Superior Court of Contra Costa County, as special masters. A hearing was held before the special masters from February 26 through February 28, 2002, in Sacramento, California. Mr. Jack Coyle and Mr. Brad Battson of the commission’s office of trial counsel presented the case in support of the charges. Judge Platt was represented by Mr. Albert M. Ellis, of the Law Offices of Hakeem, Ellis and Marengo in Stockton, California. On April 19, 2002, the masters filed their 50-page report with the commission.
Following the receipt of objections and briefs from Judge Platt and the office of trial counsel, the matter was argued before the commission on June 26, 2002. Mr. Coyle presented argument on behalf of trial counsel. Mr. Ellis represented Judge Platt, and Judge Platt also spoke in his own behalf.
FINDINGS OF FACT
A. Count One
The notice of formal proceedings alleges, and Judge Platt admits, that he had a personal relationship with Mr. G, including the fact that in October 1998, Mr. G loaned Judge Platt approximately $3,500, which debt was discharged in July 1999 by way of bankruptcy proceedings.
On or after December 28, 1999, Mrs. G (Mr. G’s wife) telephoned Judge Platt and informed the judge that her niece, Ms. M, had received a speeding ticket in San Joaquin County. Although Ms. M’s ticket would not have come before Judge Platt for any purpose in the regular course of judicial business, Judge Platt instructed his clerk, “Clerk N,” to locate the court records of the ticket. Subsequently, on or about February 29, 2000, Judge Platt instructed Clerk N to dismiss Ms. M’s ticket. As a result, the ticket was dismissed on the court’s own motion without an appearance by Ms. M and without a hearing.
*CJP Supp. 233 The masters noted that Judge Platt testified that, although he now realizes that dismissing the ticket was wrong, he did not perceive any legal or ethical problem when he told his clerk to dismiss the ticket in February 2000. Judge Platt testified that Mrs. G never asked him to dismiss the traffic ticket, and that his decision to dismiss the ticket was not influenced by any sense of obligation to Mr. G’s family due to the fact that the loan received from Mr. G was never repaid and had been discharged in bankruptcy. Judge Platt testified that he dismissed the ticket solely because Ms. M had left or was leaving for school in Southern California and would be gone for an extended period of time.
The masters found that Judge Platt’s “explanation for dismissing Ms. M’s ticket, and his claim that he did not realize at the time his action was wrong, are after-the-fact rationalizations which lack credibility.” They noted that common experience and common sense indicate that “ticket fixing is a quintessential bad act of a judge. It is an abuse of power that citizens unquestionably understand and are suspicious about.” Judge Platt was described as a careful decision maker who has a good knowledge of the law. Yet he claims that he did not realize that dismissing Ms. M’s ticket was improper. The masters found that “it is inconceivable he did not know the obvious, that ticket fixing was wrong when he dismissed Ms. M’s traffic ticket.”
The masters offered four additional grounds for their finding. First, they found that Judge Platt offered no adequate justification for the act. Judge Platt acknowledged that judges ordinarily do not act on cases which are not pending before them, that Ms. M’s departure for Southern California did not justify the dismissal of her ticket, and that there were other solutions available. Second, the masters cited the court staff’s reaction to Judge Platt’s conduct. The masters explained that Judge Platt had to ask Clerk N several times if she had found Ms. M’s ticket and that she later rebuffed Judge Platt’s request for her to inquire into the status of Mr. A’s ticket (see count six). Although Clerk N never told Judge Platt about her discomfort with his conduct, the masters “infer that Platt recognized Clerk N’s reluctance because he then approached Clerk G, rather than Clerk N, on December 26, 2000, about the ticket received by Mrs. G”[1] (see count three).
Third, the masters noted Clerk G’s testimony that Judge Platt initially told her that Mrs. G was the wife of a police officer and that when Judge Platt *CJP Supp. 234 asked her to dismiss Mrs. G’s ticket he told her to keep the matter “just between you and me.” The masters were of the opinion that both statements suggested a consciousness of wrongdoing. Judge Platt denied the statement about Mr. G, but the masters found Clerk G’s testimony more credible. Judge Platt in his testimony conceded that he must have said something to the effect of the second statement. Finally, the masters noted that, although it obviously was wrong, “Judge Platt’s dismissal of Ms. M’s ticket was consistent with his belief in the need, some might say his compulsion, to help others even at his own risk.” The commission adopts the masters’ findings of fact on count one.
B. Count Two
The notice of formal proceedings alleges, and Judge Platt admits that, sometime on or after February 8, 2000, Mrs. G telephoned Judge Platt and informed him that her husband, Mr. G, had received a speeding ticket in San Joaquin County. Although Mr. G’s ticket would not have come before Judge Platt for any purpose in the regular course of judicial business, Judge Platt instructed his clerk, Clerk N, to locate the court records of the speeding ticket. Subsequently, on or about February 29, 2000, Judge Platt instructed Clerk N to dismiss Mr. G’s ticket. As a result, the ticket was dismissed on the court’s own motion without an appearance by Mr. G and without a hearing.
Judge Platt testified before the masters that, although he now realizes that dismissing the ticket was wrong, at the time he dismissed it he did not perceive any legal or ethical problem when he instructed his clerk to dismiss the ticket. The masters noted that, according to Judge Platt, “he dismissed the ticket due to the fact that [Mr. G], a professional baseball player who was Platt’s friend, was going to be out of the state for the duration of the baseball season.”
The masters concluded, as they did in count one, that at the time he dismissed Mr. G’s traffic ticket, Judge Platt “knew this act was unjustified and wrong, but he nonetheless dismissed the ticket to help a friend (rather than for any personal gain).” They also found that Judge Platt’s act had a negative effect on the way the public perceives the integrity and impartiality of judges. The commission adopts the masters’ findings of fact on count two.
C. Count Three
The notice of formal proceedings alleges, and Judge Platt admits that, sometime on or after November 16, 2000, Mrs. G telephoned Judge Platt and informed him that she had received a speeding ticket in San Joaquin County. Although Mrs. G’s ticket would not have come before Judge Platt for any purpose in the regular course of judicial business, Judge Platt instructed his *CJP Supp. 235 clerk, Clerk N, to locate the court records of the speeding ticket. Subsequently on December 26, 2000, Judge Platt telephoned his former courtroom clerk, Clerk G, then the courtroom clerk for another judge, and told her that he wanted to be certain that Mrs. G would be eligible for traffic school in connection with her outstanding traffic ticket. Clerk G made an entry on the court records that Mrs. G had phoned and would be in to sign up for traffic school and that Judge Platt had “OK’d” her attendance at traffic school. On January 9, 2001, Judge Platt telephoned Clerk G and told her that he wanted Mrs. G’s ticket dismissed. He asked Clerk G to enter the dismissal on the court records and told her to keep the matter between him and her. Clerk G subsequently decided not to enter the dismissal and so informed Judge Platt.
Judge Platt testified before the masters that, although he now realizes that directing Clerk G to dismiss Mrs. G’s ticket was wrong, he did not perceive any legal or ethical problem when he instructed Clerk G to do so in January 2001. The masters noted that, according to Judge Platt, “he believed it was appropriate to dismiss [Mrs. G’s] ticket because she told him that she had missed the traffic school appearance and was leaving the state with her husband to attend spring training.”
The masters concluded, as they did in counts one and two, that at the time he instructed Clerk G to dismiss Mrs. G’s ticket, Judge Platt “knew this act was unjustified and wrong, but he nonetheless sought to dismiss the ticket to help a friend (rather than for any personal gain).” They also found that Judge Platt’s act had a negative effect on the way the public perceives the integrity and impartiality of judges. The commission adopts the masters’ findings of fact on count three.
D. Count Four
The notice of formal proceedings alleges, and Judge Platt admits, the following facts. Sometime after March 27, 2000, Judge Platt’s bailiff, Deputy A, informed him that F had received a speeding ticket in San Joaquin County. F was the minor son of a reserve deputy sheriff who had acted as Judge Platt’s bailiff on occasion. Deputy A explained the circumstances of F receiving a speeding ticket and asked Judge Platt if he could help. Thereafter, Judge Platt contacted the California Highway Patrol officer who had issued the speeding ticket to F and discussed the case with him ex parte. Although the speeding ticket would not have come before Judge Platt for any purpose in the regular course of judicial business, on or about May 23, 2000, Judge Platt dismissed or directed the dismissal of the speeding ticket issued to F without a hearing.
The masters explained that Deputy A felt some responsibility for F’s ticket or felt bad about it because the ticket was received while F was on an errand *CJP Supp. 236 for Deputy A and F’s father. After Deputy A explained the circumstances of the ticket to Judge Platt and asked if anything could be done about it, Judge Platt told Deputy A to get the citation number and stated that he would look into it when the matter got close to the court date. Deputy A or F’s father told Judge Platt that F had done well in school, was a productive young man who was graduating from high school, was heading to USC (University of Southern California), and was scheduled to leave for Southern California or possibly New Zealand for water polo competitions or something to that effect.
When Deputy A told Judge Platt that F had a court date to appear regarding the ticket, Judge Platt telephoned the California Highway Patrol officer who issued the ticket. Judge Platt indicated that he called the officer to “find out how the minor had reacted and find out what the specific circumstances were” in order to “make a determination about whether anything could be done with the case or should be done with the case.” The officer indicated that F’s demeanor was appropriate for somebody receiving a citation and that F acknowledged that he was speeding. Based on the information he received from the officer, Judge Platt decided to dismiss the ticket. He asked the officer if the officer had any objection to the ticket being dismissed and the officer said no. Judge Platt had identified himself as a judge, but he did not tell the officer that he was not the judge assigned to F’s case.
The masters noted that, although the matter was not pending before him, Judge Platt claimed he had authority to dismiss the ticket because he was the presiding judge of the juvenile court and the commissioners who handled traffic matters were under the presiding judge’s position. The masters found, however, that “at the time he dismissed the minor’s ticket, Platt was handling an adult murder trial, and Judge Harrington and/or Judge Parker were handling juvenile court matters.”
The masters concluded, as they did in counts one, two and three, that at the time he dismissed or directed the dismissal of F’s speeding ticket, Judge Platt “knew this act was wrong, but he nonetheless had the ticket dismissed to help the son of an acquaintance (rather than for any personal gain).” They also found that Judge Platt’s act had a negative effect on the way the public perceives the integrity and impartiality of judges. The commission adopts the masters’ findings of fact on count four.
E. Count Five
The notice of formal proceedings alleges, and Judge Platt admits, the following facts. On or about July 16, 1998, Judge Platt telephoned Judge Holland at his chambers in Stockton, where Judge Holland was assigned to *CJP Supp. 237 the juvenile dependency calendar. Judge Platt told him that a case that was assigned to him involved the family of a former client (Mr. S) from when Judge Platt had been in private practice as an attorney. Judge Platt told Judge Holland that Mr. or Mrs. S had contacted him regarding their two sons who were dependents of the court; that Mr. S had allegedly absconded with the younger child; that the family was dysfunctional; that Judge Platt had advised Mr. S to return and to cooperate with child protective services; and that Mr. or Mrs. S had inquired when they would be seeing a judge. Judge Holland told Judge Platt that the matter would be heard that day or the next, that the parents would be assigned counsel, and that a date would be scheduled for a jurisdictional hearing.
The notice of formal proceedings further alleges that, when the matter came before Judge Holland the next day, during the hearing Judge Platt “entered Judge Holland’s courtroom through a side door and remained in the courtroom near the door, creating the impression that [he was] in a special position to influence the judge and that [he was] attempting to lend the prestige of [his] judicial office to advance the interests of Mr. S or his family.” Judge Platt admits, and the masters found, that Judge Platt did briefly stand in the doorway to Judge Holland’s court, but that he did so solely to make sure that the S family had remained in the court and that he left almost immediately after determining that they were there. The masters found that Judge Platt’s appearance did not create the impression that Platt was in a special position to influence Judge Holland, as the S family did not see him and there was a lack of evidence to establish that anyone else in the courtroom, other than Judge Holland, actually saw Judge Platt.
Judge Platt testified that late in the afternoon of July 16, 1998, Mrs. S telephoned him in his chambers and told him one of her sons was the subject of a pending juvenile dependency proceeding. Mrs. S expressed concern that the father and son had “taken off” and were “going to run” rather than appear at the dependency hearing. Mrs. S asked what could be done about this problem. Judge Platt told her to locate her husband and son and talk them into coming to court and cooperating. She indicated that they had no faith in the system, and Judge Platt told her that if they would be more comfortable, they could come to his chambers and he would take them to the dependency proceeding. Judge Platt then checked with the juvenile court, determined that the proceeding was to be held the next morning before Judge Holland, and telephoned Judge Holland.
The following morning Mr. S and his son came to Judge Platt’s courtroom. He escorted them to Judge Holland’s courtroom and told them to remain there until their case was called. Judge Platt returned to his courtroom to do his morning calendar. At the midmoming break, Judge Platt went back to *CJP Supp. 238 Judge Holland’s courtroom and looked into the courtroom through an open side door that led into a private hallway. The S family was at the counsel table with their backs to him. After seeing that they were there, Judge Platt left without saying anything to anyone. The commission adopts the masters’ findings of fact on count five.
F. Count Six
The notice of formal proceedings alleges that sometime in 1999 or 2000, Judge Platt telephoned Commissioner Kronlund, who was assigned to the Tracy branch of the San Joaquin Superior Court. Judge Platt said he was calling about a friend of his, Mr. A, whom he referred to as his godfather. Judge Platt asked the commissioner questions concerning the handling of traffic tickets, in particular the handling of late fees. Mr. A had received a speeding ticket on October 12, 1999. He appeared before Commissioner Kronlund in April 2000, pled guilty to the speeding ticket, and was ordered to pay a fine and fees, including a late fee.
Judge Platt—in both his answer and testimony—admits to the factual allegations, but denies that he asked the commissioner to do anything with respect to the traffic ticket or that he in any way attempted to influence her.
Judge Platt testified that Mr. A is his godfather. At some point, Mr. A told Judge Platt that he had received a traffic ticket, it was old, and he had never gone to court about it. Mr. A wanted to find out whom he could contact to schedule a court appearance. Judge Platt told him that he did not know how the Tracy court set up its traffic calendar, but that he would find out. Because the ticket was old, Judge Platt assumed a late fee would be an issue. Judge Platt called Commissioner Kronlund because they had previously been colleagues in the district attorney’s office and he knew she would be able to tell him how Mr. A could get the matter on the calendar. Judge Platt did not know whether she would be the commissioner who would ultimately adjudicate Mr. A’s ticket. The commissioner told him that a personal appearance would have to be made in the clerk’s office on a Thursday in order to put the matter on the calendar, and she may have mentioned how late fees were handled. Judge Platt relayed the information to Mr. A and his wife, but he did not tell Mr. A that he had contacted Commissioner Kronlund to get the information.
In his testimony before the masters, Judge Platt explained his conversation with Commissioner Kronlund as follows:
“Q. I may have missed this, but, Judge Platt what did you tell the Commissioner was your reason for calling?
*CJP Supp. 239 “A. To find out what date and time traffic citations appear so that somebody could put it on the calendar, and I mentioned—and I believe I did mention his name.
“Q. Did you mention you had some relationship to this individual?
“A. I believe so, either as a very close friend—I don’t know that I said he was my godfather, but certainly I said it was somebody that I knew and was active in the community, and that was the reason I gave the name, is I knew that Barbara or that Commissioner Kronlund was active in the community, and that that individual at some point, I assumed, would be putting something on the calendar down there, and I didn’t know that it was or wasn’t her calendar, but that certainly was the information that I provided and asked for.”
In her stipulation in lieu of testimony, Commissioner Kronlund recalled receiving a phone call from Judge Platt about his friend, Mr. A, having received a traffic ticket. She recalled that he asked questions about how late fees in traffic cases were determined and whether there was a “going rate.” Commissioner Kronlund indicated that Judge Platt did not ask her “to do anything with the ticket, such as dismissing it or taking care of the ticket,” and that she did not know “whether [Mr. A] to whom Judge Platt referred ever showed up in her courtroom.”
The commission adopts the masters’ findings that Judge Platt telephoned Commissioner Kronlund and mentioned that his friend, Mr. A, had received a traffic ticket.
G. Count Seven
The notice of formal proceedings alleges that, at the end of a workday in approximately 1999, Judge Platt approached a clerk in the clerk’s office concerning a stay of execution of an order that had been issued by Judge Smith in an unlawful detainer action. Judge Smith had granted the landlord possession of the premises. Judge Platt approached the clerk shortly after Judge Smith had denied the tenant’s request for a stay of execution of her order. The notice alleges that the tenant was a personal acquaintance of Judge Platt’s and accompanied him on his visit to the clerk. Judge Platt instructed the clerk to enter his order granting a stay, effectively vacating Judge Smith’s order.
The masters found that Judge Platt did enter a stay of execution in the unlawful detainer action, but that there was nothing improper in his doing so. They found that Judge Platt entered the clerk’s office in order to pick up his *CJP Supp. 240 mail and that he overheard a person at the public counter speaking in a raised voice and giving the clerk a “hard time.” Instead of going to the mail area, Judge Platt turned to the clerk and asked if she needed assistance. The clerk explained that the person was requesting a stay of an eviction order, which required that he be out by 8:00 a.m. the following morning. As he spoke to the clerk, Judge Platt recognized the person who was seeking the stay as someone he had seen refereeing youth basketball games. Judge Platt had never handled an unlawful detainer action, but the person was persistent, and the clerk indicated that both Judge Smith and the judges in the other civil departments, who reviewed such emergency requests, had left for the day. The clerk indicated that any judge could look at the request and make a determination whether to grant a stay. Judge Platt decided to grant the temporary stay.
The masters found that there was a lack of clear and convincing proof to support the allegations in count seven that Judge Platt acted at the ex parte request of a personal acquaintance in a matter not pending before him. Trial counsel agrees. The commission adopts the masters’ findings on count seven and hereby dismisses count seven.
H. Count Eight
The notice of formal proceedings alleges that, during the spring or summer of 2000, Judge Platt visited Judge James E. Hammerstone, Jr., at his chambers in the Stockton branch of the court. Judge Platt told Judge Hammerstone that a personal acquaintance of Judge Platt’s, or a family member of the acquaintance, was being held in the county jail for a theft-related offense. Judge Platt asked Judge Hammerstone to grant an own recognizance (O.R.) release or to call the jail and order the individual released on her own recognizance. Judge Hammerstone declined to do so.
Judge Platt, in his answer and his testimony, admits that he visited Judge Hammerstone and told him that a family member of an acquaintance was being held in the county jail and raised the issue of a release on one’s own recognizance. Judge Platt, however, contends that he told Judge Hammerstone that the family would be requesting a release on her own recognizance, and that he was not vouching for them.[2]
Judge Hammerstone, however, was firm in his testimony that Judge Platt did ask him to grant the relative release on her own recognizance.
*CJP Supp. 241 The masters concluded: “We find credible and convincing Judge Hammerstone’s testimony that Judge Platt made an unexpected ex parte visit to Hammerstone’s chambers and asked Hammerstone to grant an O.R. release for a family member of an acquaintance of Platt’s. Not only did Platt’s testimony to the contrary lack credibility, it was inconsistent with Platt’s personality trait which motivates him to help others in need. ... In every other alleged incident, Platt sought to help a friend or acquaintance. But Platt claimed that, in this instance, he in effect was trying to undermine the effort of an acquaintance to receive help for a problem. Rather than ask Hammerstone to grant an O.R. release, Platt went all the way to Hammerstone’s chambers simply to tell him that Platt had only seen the family at church and that Hammerstone could factor this into whatever information the family gave him about their relationship with Platt. In other words, Platt ‘wasn’t vouching for them’ and did not want Hammerstone to overvalue the fact that they knew Platt, or otherwise be misled by the information. Simply stated, we find this unbelievable.”
The commission adopts the masters’ findings of fact on count eight.
CONCLUSIONS OF LAW
The California Constitution, article VI, section 18, subdivision (d) provides that a judge may be censured or removed from office for an act that constitutes “willful misconduct in office” or “conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” It further provides that a judge may be publicly or privately admonished for engaging in “improper action.” (Ibid.)
A judge, to commit willful misconduct, “must (1) engage in conduct that is unjudicial and (2) committed in bad faith, (3) while acting in a judicial capacity.” (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1091 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).) Whether a judge’s conduct is “unjudicial” is measured by reference to the California Code of Judicial Ethics and its canons. (Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (Dodds); accord, Oberholzer v. Commission on Judicial Performance (1999) 20 Cal.4th 371, 395 [84 Cal.Rptr.2d 466, 975 P.2d 663].) “A judge acts in bad faith only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.) “A judge is acting in a judicial capacity while performing one of the functions, whether adjudicative or *CJP Supp. 242 administrative in nature, that are associated with the position of a judge or when the judge uses or attempts to use the authority of the judicial office for an improper purpose.” (Id. at p. 1104, citing Dodds, supra, 12 Cal.4th at p. 172.)
The Supreme Court has defined “prejudicial conduct” as follows: “Prejudicial conduct is ‘either “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office” [citation] or “willful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity” [citation].’ (Doan v. Commission on Judicial Performance [(1995)] 11 Cal.4th [294,] 312 [45 Cal.Rptr.2d 254, 902 P.2d 272], original italics (Doan).) In this context, bad faith means a culpable mental state beyond mere negligence and consisting of either knowing or not caring that the conduct being undertaken is unjudicial and prejudicial to public esteem. In sum, to constitute prejudicial conduct, a judge’s actions must bring ‘the judicial office into disrepute,’ that is, the conduct would appear to an objective observer to be prejudicial to ‘ “public esteem for the judicial office.” ’ (Kennick v. Commission on Judicial Performance [(1990)] 50 Cal.3d [297,] 314 [267 Cal.Rptr. 293, 787 P.2d 591].)” (Broadman, supra, 18 Cal.4th at pp. 1092-1093.)
An improper action is conduct that violates the California Code of Judicial Ethics, but which, when viewed “from the perspective of an objective observer,” does not constitute prejudicial conduct. (Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 899 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams).)
A. Counts One Through Four
Each of Judge Platt’s attempts to dismiss the four separate traffic tickets violated canon 1 (a judge shall uphold the integrity of the judiciary), canon 2A (a judge shall respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), canon 2B(1) (a judge shall not allow family, social, or other relationships to influence the judge’s judicial conduct or judgment; a judge shall not convey, or permit others to convey, that any individual is in a special position to influence the judge), canon 2B(2) (a judge shall not lend the prestige of judicial office to advance the personal interests of others), and canon 3B(7) (a judge shall perform the duties of judicial office impartially by permitting every person who has a legal interest in a proceeding, including the prosecuting authority, a foil right to be heard according to law) of the California Code of Judicial Ethics.
*CJP Supp. 243 Judge Platt’s conduct concerning the four separate traffic tickets constitutes willful misconduct. In each instance, Judge Platt, acting in his judicial capacity, sought to dismiss a traffic ticket that was not before him based on ex parte communications. The masters found, and the commission agrees, that in each instance Judge Platt acted in bad faith because he acted for a purpose other than the faithful discharge of his judicial duties, “i.e. to benefit a friend.” In addition, the masters concluded, and the commission agrees, that Judge Platt’s actions had a negative effect on the way the public perceives the integrity and impartiality of judges.
B. Count Five
The masters concluded, and the commission agrees, that Judge Platt’s appearance in the doorway of Judge Holland’s courtroom did not create the impression that Judge Platt was in a special position to influence Judge Holland and that Judge Platt was not consciously attempting to influence his decision in the case or to lend the prestige of his judicial office to advance the interests of the S family. In sum, there is insufficient evidence to support any conclusion of unjudicial conduct based on Judge Platt’s appearance in a side doorway of Judge Holland’s courtroom during a proceeding involving the S family.
The evidence before the commission, however, supports the conclusion that Judge Platt, in relaying information concerning the S family to Judge Holland in the initial phone call that he placed to Judge Holland, violated the California Code of Judicial Ethics. The masters found (as Judge Platt testified) that he had already learned from the clerk that the S family matter would be before Judge Holland the next morning when he telephoned Judge Holland. In his verified answer, Judge Platt admits that he “informed Judge Holland that he had been contacted by the family of Mr. S regarding their two sons who were dependents of the court; that Mr. S allegedly had absconded with the younger child; that the family was dysfunctional; that [Judge Platt] had advised Mr. S to return the boy and to cooperate with child protective services; and that Mr. or Mrs. S had inquired when they would be seeing a judge.”
Count five alleges that Judge Platt’s actions violated canon 3B(7) of the California Code of Judicial Ethics, which includes a proscription against ex parte communications. In his response brief to the commission, Judge Platt argues that the masters’ finding that he “became involved in the S family dependency matter for the sole reason of ensuring that the father and son would come to court rather than hide from authorities,” supports a conclusion that his phone conversation with Judge Holland was permissible under canon 3B(7)(b), which provides that a “judge may consult with court personnel *CJP Supp. 244 whose function is to aid the judge in carrying out the judge’s adjudicative responsibilities or with other judges.”
This argument is not well taken because the information conveyed—that the family was dysfunctional, the father had absconded with the son and that Judge Platt had advised them to return—in no way furthered the purpose of “ensuring that the father and son would come to court” and in no way facilitated either Judge Platt’s or Judge Holland’s “adjudicative responsibilities.”[3] In fact, the ex parte conveyance of information relevant to the substance of the underlying issues before Judge Holland compromised his impartiality. Judge Holland could do nothing until the case was called the following morning and the father and son either appeared or did not appear. Had they not appeared, Judge Holland would have been placed in the position of having to determine what action to take without considering the improper ex parte communication from Judge Platt that the father and son had absconded and that Judge Platt had advised them to appear in court.
The commission concludes that Judge Platt’s ex parte conveyance of information concerning the S family to Judge Holland violated canon 3B(7) and canon 2 (a judge shall avoid impropriety and the appearance of impropriety in all of the judge’s activity) of the California Code of Judicial Ethics.
The commission further concludes that this conveyance of substantive information constitutes an improper action under article VI, section 18, subdivision (d) of the California Constitution. The communication violated the California Code of Judicial Ethics, but in light of Judge Platt’s arguably laudable reason for becoming involved in the proceeding and the fact that the communication in no way benefited either Judge Platt or the S family, the commission concludes that it is not clear that the communication brings the judiciary into disrepute.
C. Count Six
Judge Platt admits to contacting Commissioner Kronlund, asking her questions concerning the handling of traffic matters and informing her that his godfather, Mr. A, had a traffic ticket and that he was active in the community. The commission concludes that in conveying this information to the commissioner, Judge Platt violated the California Code of Judicial Ethics.
The masters found that Judge Platt “did not know, or attempt to find out, what commissioner would handle Mr. A’s ticket when it was calendared,” *CJP Supp. 245 “did not talk with Kronlund about the specific case pending before her,” and “did not ask her to take any action on the ticket.” The commission accepts these findings, but they do not compel a conclusion that Judge Platt did not intend to attempt to influence the commissioner. Judge Platt could have learned all about the procedures from Commissioner Kronlund (or the clerk’s office) without revealing that he was calling on behalf of his godfather. Judge Platt does not offer any legitimate reason for telling the commissioner about Mr. A.[4] Furthermore, the fact that Commissioner Kronlund was not influenced does not mean that she did not perceive the telephone call as an attempt to influence.[5]
The commission agrees with former Judge David M. Rothman when he writes in California Judicial Conduct Handbook (2d ed. 1999) section 5.10, pages 131-132: “A traffic referee is about to hear a speeding ticket case. A judge sends a note to the referee indicating that the offender is a very good citizen. What should the referee do? This is an inappropriate ex parte communication and the judge who sent the note has engaged in judicial misconduct by attempting to influence another judicial officer. The contact must be disclosed to the parties. In addition, although recusal is not mandatory, it must be considered depending on consideration of the factors set forth in Code of Civil Procedure sections 170.1(a)(1), (6).” In the example, the judge does not explicitly ask the referee to do anything. The judge simply mentions that the offender is a “very good citizen.” The attempt to influence is inherent in the unsolicited telephone call and the ex parte conveyance of positive information about the offender. The judge’s failure to explicitly ask the referee to do anything does not change the nature of the communication.
*CJP Supp. 246 The commission concludes that Judge Platt’s conveyance of information to Commissioner Kronlund regarding Mr. A violated canons 1, 2A, 2B(1), 2B(2) and 3B(7) of the California Code of Judicial Ethics.
The commission further concludes that Judge Platt’s conduct constitutes conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Prejudicial conduct includes “ ‘ “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.” ’ ”[6] Even accepting that Judge Platt conveyed the information in “good faith,” this was a violation of the California Code of Judicial Ethics. In addition, this type of subtle attempt to influence is unquestionably prejudicial to public esteem for the judicial office. As the masters noted, ticket fixing “is a quintessential bad act of a judge,” and an “abuse of power that citizens unquestionably understand and are suspicious about.” The public will perceive an attempt to influence the disposition of a ticket whenever a judge calls a commissioner—who may or may not hear a traffic ticket—and tells her that the offender is his godfather and active in the community, even if the judge does not explicitly ask the commissioner to do anything.
D. Count Eight
The commission agrees with the masters that Judge Platt, in visiting Judge Hammerstone and asking him to grant an O.R. release, was attempting to use the prestige of his office to advance the personal interests of an acquaintance and that his conduct violated canons 1, 2A, 2B(1), 2B(2) and 3B(7) of the California Code of Judicial Ethics.
Judge Platt’s conduct constitutes willful misconduct in office. The masters noted that Judge Platt was acting in a judicial capacity “because he was ‘us[ing] the authority of [his] judicial office for an improper purpose.’ (Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at p. 1104, [citing Dodds, supra, 12 Cal.4th at p. 172].)” The conduct was undertaken in bad faith because Judge Platt acted for a purpose other than the faithful discharge of his judicial duties, i.e., in an attempt to benefit the relative of an acquaintance.
DISCIPLINE
A. Criteria
When determining the appropriate resolution of a disciplinary proceeding, the commission is guided by the Supreme Court’s pronouncement *CJP Supp. 247 that the purpose of the proceeding “ ‘is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ”[7]
The Supreme Court has recognized that in determining the appropriate discipline, each case must be considered on its own facts. “Proportionality review based on discipline imposed in other cases, however, is neither required nor determinative. The factual variations from case to case are simply too great to permit a meaningful comparison in many instances. ‘Choosing the proper sanction is an art, not a science, and turns on the facts of the case at bar.’ ”[8]
Even though each case is considered on its own facts, we are guided in our evaluation of the facts by opinions of the Supreme Court. In decisions concerning the removal of judges, the Supreme Court has referred to several factors. It has often emphasized the number of acts of misconduct.[9] In Furey v. Commission on Judicial Performance, supra, 43 Cal.3d at page 1307, footnote 2, the court explained that “the disposition of a case depends in large measure on the nature and number of charges found to be true . ...” In Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958] (Fletcher), the Supreme Court, in agreeing with the commission’s recommendation to remove Judge Fletcher, noted: “ ‘The number of wrongful acts is relevant to determining whether they were merely isolated occurrences or, instead, part of a course of conduct establishing “lack of temperament and ability to perform judicial functions in an even-handed manner.” [Citation.]’ (Wenger [v. Commission on Judicial Performance (1981)] 29 Cal.3d [615,] 653 [175 Cal.Rptr. 420, 630 P.2d 954].) We have determined that petitioner twice committed willful misconduct and committed prejudicial misconduct on multiple occasions. ‘Together
*CJP Supp. 248 these incidents reflect a continuing, pervasive pattern of’ misconduct. (Kloepfer, supra, 49 Cal.3d at p. 849.)”
Notwithstanding the court’s emphasis on the number of offenses, an overarching consideration remains whether removal is necessary to protect the public, enforce rigorous standards of judicial conduct and maintain public confidence in the integrity and independence of the judicial system. In Doan v. Commission on Judicial Performance, supra, 11 Cal.4th at page 339, the Supreme Court removed a judge for willful and prejudicial conduct that displayed moral turpitude, dishonesty and corruption, but noted that it “would hesitate to remove a judge who showed himself ready, willing, and able to reform under a less severe sanction.”[10] The ability to reform or conversely the likelihood that the judge will reoffend if permitted to remain on the bench, thus emerges as a second important factor in deciding whether the removal sanction should be applied. An isolated instance of misconduct may arise from a momentary ethical lapse, but a continuing pattern “reflects poor judgment and lack of judicial temperament.”[11]
The Supreme Court has identified two additional factors suggesting inability to reform and hence unsuitability for judicial office. A judge’s failure to appreciate or admit to the impropriety of his or her acts indicates a lack of capacity to reform. In Fletcher, supra, 19 Cal.4th at page 919, the Supreme Court noted that “contrary to the contrite tone he sounds in this court, petitioner’s primary response to the misconduct allegations during the Commission proceedings was to allege a conspiracy against him.” The court concluded as to Judge Fletcher that: “[T]he record ‘belies petitioner’s claim that he has learned from past experience and has modified his courtroom behavior. It demonstrates instead an inability to appreciate the importance of, and conform to, the standards of judicial conduct that are essential if justice is to be meted out in every case.’ (Kloepfer, supra, 49 Cal.3d at p. 866, fn. omitted, original italics.) It ‘does not suggest that petitioner has, or will be able to, overcome [his demonstrated lack of judicial temperament] and that similar incidents will not recur.’ (Ibid.)”[12]
Finally, the failure of past sanctions to effect a change in conduct also suggests a lack of ability to reform and unsuitability for judicial office. The Supreme Court has made note of prior discipline in deciding whether removal *CJP Supp. 249 is appropriate. (See Doan, supra, 11 Cal.4th at pp. 339-340; McCullough v. Commission on Judicial Performance, supra, 49 Cal.3d at p. 197.) In Doan, supra, 11 Cal.4th at page 340, the court wrote:
“Lastly, Doan did not learn from her public reproval in 1990 for lending the prestige of her office to advance the private interest of others. She again lent the prestige of her office to advance the private interest of others, even though she had promised not to do so in connection with the 1990 public reproval, in the matters relating to Darlene’s nephew Darren Powell in 1992, Meneses in 1993, and Darlene herself in 1993.
“In sum, Doan has had three opportunities for reformation. She will have no more.”
B. The Case at Bar
There are two troubling features in this case. First, there is a pattern of Judge Platt’s continuing failure or inability to recognize when his professional responsibilities and personal proclivities clash. Second, Judge Platt’s responses to the allegations raise concerns about his truthfulness.
1. Pattern of Misconduct.
Judge Platt took the bench in 1994. In the fall of 1997, Judge Platt received a private admonishment because in 1995, 1996, and 1997, he (a) solicited attorneys who appeared before him to purchase raffle tickets for a fundraiser for a local church and to purchase tickets for a fundraiser for a local childcare center, and (b) placed open boxes of candy bars in his chambers and on his bailiff’s desk for purchase by attorneys and court staff, with the proceeds benefiting his children’s parochial school. The private admonishment noted that in 1995, “Judge Platt was advised of the impropriety of soliciting fundraising contributions from attorneys and court staff by two of his fellow judges.” Judge Platt’s letter accepting the private admonishment offered his assurance that, “not just in the complaint areas, but in all aspects of my future, I shall conduct myself and my affairs in compliance with ... the Code of Judicial Ethics.”
Despite this assurance, in July 1998, Judge Platt, at the request of a former client, injected himself in a juvenile dependency proceeding pending before Judge Holland (count five).
In December 1999, Judge Platt received his first phone call from Mrs. G telling him that her niece Ms. M had received a speeding ticket. Even though the ticket was not before him and would not in the ordinary course of judicial *CJP Supp. 250 business come before him, Judge Platt apparently offered to be of some assistance and instructed his clerk to locate the court records of the speeding ticket. (Count one.)
In February 2000, Mrs. G again called Judge Platt and this time informed him that her husband (Mr. G) had received a speeding ticket. Again, even though the ticket was not before him and would not in the ordinary course of judicial business come before him, Judge Platt apparently offered to be of some assistance and instructed his clerk to locate the court records of the speeding ticket. (Count two.)
Three weeks later, Judge Platt instructed his clerk to dismiss Ms. M’s ticket and Mr. G’s ticket. Both tickets were dismissed on the court’s own motion without an appearance or hearing.
Sometime in 1999 or 2000, Judge Platt’s godfather, Mr. A, informed him that he had an old speeding ticket that he had never gone to court on. He wanted to know whom he should contact to schedule a court appearance. Judge Platt called one of the two commissioners at the Tracy branch of the court to learn how Mr. A might go about getting his ticket on calendar. In his conversation with the commissioner, Judge Platt mentioned Mr. A’s name and that he was active in the community. (Count six.)
In March or April 2000, Judge Platt’s bailiff informed the judge that F, the son of a reserve bailiff that the judge knew, had received a speeding ticket. The bailiff asked if Judge Platt could do something to help. The judge told the bailiff to get the citation number and offered to look into the matter when F had a court date. The bailiff subsequently told Judge Platt that F had a court date. Judge Platt then attempted to contact the California Highway Patrol officer who had issued the ticket. After several unsuccessful attempts, Judge Platt spoke with the officer, listened to the officer’s perspective and ascertained that the officer did not oppose the dismissal of the ticket. Even though the ticket was not pending before him, Judge Platt caused the ticket to be dismissed without any appearance or court hearing. (Count four.)
In the summer of 2000, a family from Judge Platt’s church approached him concerning their daughter who was in jail for a theft-related offense. Judge Platt testified that although he did not know the family well, he indicated that he would talk to the judge who would hear the daughter’s case. The following day, Judge Platt visited Judge Hammerstone in his chambers and asked him to grant the daughter a release on her own recognizance. (Count eight.)
Sometime on or after November 16, 2000, 11 months after she had first called him, Mrs. G telephoned Judge Platt and told him that now she had *CJP Supp. 251 received a speeding ticket. Again Judge Platt apparently offered to help. He asked his clerk, Clerk N, to locate the court records of the speeding ticket. Even though he asked her a couple of times, Clerk N did not produce the record. On December 26, 2000, Judge Platt telephoned his former clerk, Clerk G, and told her that he wanted to be certain that Mrs. G would be eligible for traffic school in connection with her outstanding traffic ticket. On January 9, 2001, Judge Platt again called Clerk G and this time asked her to enter a dismissal of Mrs. G’s ticket on the record. Clerk G at first agreed to, then decided not to and so informed Judge Platt. (Count three.)
In May 2001, the commission commenced its investigation in response to a complaint noting Judge Platt’s conduct with regard to Mrs. G’s speeding ticket.
The above chronology suggests that throughout his judicial career, Judge Platt has been willing to use his judicial position for the benefit of friends and acquaintances, even after being warned by his colleagues and privately admonished by the commission.
2. Issues of Credibility.
Judge Platt had served 15 years in the district attorney’s office and had been a judge for five years when Mrs. G first called him regarding a traffic ticket. He did not immediately dismiss the ticket. He asked his clerk to locate the court records for the speeding ticket, which she did. Still he did not dismiss the ticket until after Mrs. G had again called him and told him about Mr. G’s ticket. He dismissed both tickets in February 2000, some two months after Mrs. G had initially called him. Thus, the dismissals were entered after Judge Platt had considered the matters several times. Nonetheless, Judge Platt told the masters that at the time that he dismissed the tickets, he did not perceive any legal or ethical problem with doing so.
The masters found that Judge Platt’s alleged ignorance was an after-the-fact rationalization that lacks credibility. The masters cited Judge Platt’s reputation as a careful decision maker with a good knowledge of the law and concluded that “it is inconceivable he did not know the obvious, that ticket fixing was wrong when he dismissed [Ms. M’s] traffic ticket.”
Judge Platt also had a number of opportunities to consider his actions in regard to F’s speeding ticket. His bailiff brought the ticket to his attention several times and Judge Platt testified that it took him a couple of attempts to contact the officer who issued the ticket. Judge Platt proceeded to elicit information about F from the officer, his bailiff, and even F’s father. *CJP Supp. 252 Nonetheless, Judge Platt told the masters that he did not perceive any legal or ethical problems with his handling of the matter and dismissal of the ticket in May 2000.[13]
Judge Platt also testified before the masters that he believed he had authority to dismiss F’s ticket because he was the presiding judge of the juvenile court and the commissioners who handle the traffic matters for juveniles were under him. The masters, however, found that at the time he dismissed the ticket, Judge Platt was handling an adult murder trial. This finding raises concerns as to whether the claim of authority is another “after-the-fact rationalization.”
Judge Platt admits that he called Commissioner Kronlund, but protests that he did not have any intention to influence her. Nonetheless, as previously noted, he offers no valid alternative explanation for revealing his relationship to Mr. A and Mr. A’s involvement in civic affairs.
Judge Platt’s testimony surrounding his visit to Judge Hammerstone is troublesome. He testified before the masters that he told the parents that he would talk to the judge who would hear their daughter’s case. He then told the masters that he only visited Judge Hammerstone to alert him that the parents might claim a friendship and that he, Judge Platt, could not vouch for the family. Did Judge Platt, when he told the family he would talk to the judge, intend to undermine the family’s case by telling the judge that he could not vouch for the family? The masters found Judge Platt’s explanation to be “unbelievable,” noting that the explanation was “inconsistent with Platt’s personality trait which motivates him to help others in need.”[14]
Judge Platt testified that when Mrs. G called him in October 2000, it did not occur to him that, as he had dismissed two tickets at her request, she might expect him to do so a third time. Judge Platt had several opportunities to contemplate his possible actions as his clerk, Clerk N, failed to get him the information on the ticket as he requested. Eventually, Judge Platt contacted his former clerk, Clerk G, and asked her first to note that Mrs. G was eligible for traffic school and subsequently to dismiss the ticket. Judge Platt testified that he contacted Clerk G because Clerk N was absent. The evidence, *CJP Supp. 253 however, shows that Clerk N was not absent. Furthermore, there was evidence that when Clerk G asked Clerk N why Judge Platt had contacted her, Clerk N responded that the judge had done so because he knew that Clerk N would not dismiss the ticket for him.
Clerk G further testified that Judge PÍatt told her that Mrs. G was the wife of a police officer and that when the judge asked her to dismiss the ticket he told her to keep it between themselves. The masters found Clerk G’s testimony to be credible. Judge Platt initially denied both allegations. However, he testified before the masters that while he did not recall saying any particular words, he may well have said something to the effect of keeping the matter between themselves. The masters found Judge Platt’s statement to be “strong evidence” that he knew the ticket fixing was wrong. Despite all of the above, Judge Platt maintained before the masters that at the time he handled Mrs. G’s ticket he did not see any ethical problems with his actions.
3. Application of the Standards Guiding the Commission.
The first of the three standards guiding the commission’s decision is “protection of the public.” This concern prompts the question, “Is Judge Platt likely to again violate the Code of Judicial Ethics?” The commission is of the opinion that Judge Platt is unlikely to conform his future conduct to the canons.
As noted, a common thread running through all of the counts of misconduct against Judge Platt is his failure to recognize the restraints imposed by his ethical responsibilities as a judge. Whether it is fundraising for a childcare center, helping a niece of a friend with a ticket, or trying to assist a friend from church, Judge Platt repeatedly took up the cause without considering ethical restraints. Furthermore, despite his expressions of remorse, it appears that Judge Platt has not been able to honestly admit or accept his misconduct. Judge Platt admits the fact that he fixed, or attempted to fix, four traffic tickets. He contends, however, that he did not know that it was wrong to do so when he acted. The masters, to be blunt, say this is a he. There is sufficient evidence to support the masters’ findings. Accordingly, it appears that this is a judge who either (a) will not or cannot face the reality that he knowingly engaged in judicial misconduct, or (b) has such a myopic view of his conduct that three masters reasonably believe that he is not telling the truth.
The second standard guiding the commission’s decision is “the enforcement of rigorous standards of judicial conduct.” This concern prompts the question, “What message will the commission’s decision send to the bench?”
*CJP Supp. 254 Since the advent of the commission, judges have been held to a higher standard of conduct than attorneys.[15] The Supreme Court has noted that it expects all judges to comply with the canons and that failure to do so “ ‘suggests performance below the minimum level necessary to maintain public confidence in the administration of justice.’ ”[16]
Judge Platt, after being privately admonished for allowing his judicial office to benefit the interests of others, admittedly dismissed three tickets and attempted to dismiss a fourth ticket to benefit friends and acquaintances. He did so after having had opportunities to consider his actions. He also injected himself into a request for O.R. in a criminal case and into a juvenile dependency proceeding, neither of which was before him. Judge Platt’s only explanation is that he did not recognize at the time that his actions were wrong—a response that the masters found to be incredible.
Judges are not insulated from society. Most if not all judges have friends and acquaintances who on occasion receive traffic tickets or have other difficulties that result in court appearances. Thus, there is always a temptation to do a friend a favor, to put in a good word with the judicial officer who will preside over a traffic ticket. Accordingly, the commission’s response to proven instances of ticket fixing should discourage requests for favors and strengthen judicial resistance to such requests.
The third standard guiding the commission is “the maintenance of public confidence in the integrity and independence of the judicial system.” This prompts the question, “What message will the commission’s decision send to the public?”
Ticket fixing is among the most obvious forms of abuse of judicial authority. As the masters noted, “it is an abuse that citizens unquestionably understand and are suspicious about.” An ordinary citizen would not respect a judge who dismissed multiple tickets, that were not even before him, and then claimed that he did not recognize that doing so was wrong.
4. Mitigation.
The masters noted that while factors in mitigation do not excuse willful misconduct, the commission may take them into account in considering the totality of the circumstances that are pertinent to determining the *CJP Supp. 255 appropriate discipline.[17] The masters listed five factors: (1) Judge Platt’s remorse, (2) his early acknowledgement of wrongdoing, (3) his performance as a judge, (4) his support in the legal community, and (5) his capacity to rehabilitate.[18] In addition, the record shows that Judge Platt voluntarily sought counseling on ethics issues from retired Judge Martin.
The commission notes Judge Platt’s expressions of remorse, his apologies to his colleagues, court staff and others, and his efforts to better understand the California Code of Judicial Ethics. The problem, however, is that, although Judge Platt intellectually recognizes ethical issues once they are brought to his attention,[19] Judge Platt, despite advice from his colleagues, a prior admonition, and even lack of cooperation from his staff, repeatedly fails to recognize that his proclivity to help others causes him to violate judicial canons.
CONCLUSION
The commission has determined to remove Judge Platt from office.[20] This conclusion is mandated by two interrelated factors. First, after having been privately admonished, Judge Platt dismissed three traffic tickets, and attempted to dismiss a fourth, and twice attempted to improperly influence another judicial officer. In each instance he had the opportunity to consider alternatives before he acted. Furthermore, none of the tickets would have come before him in the ordinary course of judicial business. Second, Judge Platt maintains that when he dismissed the tickets he did not see any ethical problems with his actions. The commission agrees with the masters that it is inconceivable that Judge Platt did not know that ticket fixing is wrong.
The application of the guiding standards for disciplinary proceedings supports removal. The commission’s responsibility for the “protection of the public” weighs against subjecting future litigants, witnesses, the public and court staff to a judge who is dishonest[21] or who, after a career in the district attorney’s office and five years on the bench, cannot recognize the impropriety of ticket fixing when he does it. Judge Platt’s insensitivity to ethical *CJP Supp. 256 restraints is further reflected in his two attempts to influence other judicial officers on behalf of a friend or an acquaintance. The “enforcement of rigorous standards of judicial conduct” favors removal, as anything less might appear to countenance Judge Platt’s multiple acts of willful misconduct. The “maintenance of public confidence in the integrity and independence of the judicial system” also weighs in favor of removal. The public understands ticket fixing and knows that it is wrong. The public need not tolerate a judge who dismisses multiple traffic tickets for friends and acquaintances and then says he saw nothing wrong with what he was doing when he did it.
This decision shall constitute the order of removal of Judge Michael E. Platt and pursuant to the provisions of article VI, section 18 of the California Constitution and rule 120(a) of the Rules of the Commission on Judicial Performance, Judge Michael E. Platt is hereby disqualified from acting as a judge.
Commission members Judge Rise Jones Pichon, Justice Vance W. Raye, Ms. Lara Bergthold, Judge Madeleine I. Flier, Mr. Marshall B. Grossman, Mr. Michael A. Kahn, Mrs. Crystal Lui, Ms. Barbara Schraeger, and Dr. Betty L. Wyman voted in favor of all the findings and conclusions expressed herein and in the removal of Judge Michael E. Platt from judicial office. Commission member Ms. Ramona Ripston voted in favor of all the findings and conclusions expressed herein, but voted to publicly censure Judge Platt. One public member position is vacant.
The judge’s petition for review by the Supreme Court was denied on February 19, 2003.

 The masters further note that Judge Platt explained that he called “Clerk G” because he was unable to contact Clerk N, who he believed was on vacation or had taken a few days off. Clerk N, however, testified that she was at work on that date. Also, when Clerk G called Clerk N to inquire why Judge Platt had contacted her, Clerk N responded that the judge knew that she, Clerk N, would not enter the dismissal of Mrs. G’s ticket.

 Judge Platt testified before the masters: “[W]hen I handled the arraignment calendar for almost two years or two-and-a-half years, on countless occasions people would mention they knew somebody, and I wanted to make sure that Judge Hammerstone knew that if that was done I knew these people, I did not know the individual that was arrested, I wasn’t vouching for them.”

 As noted in trial counsel’s reply brief, the consultation exception of California Code of Judicial Ethics canon 3B(7)(b) cannot apply because Judge Platt, due to his relationship to the S family, was disqualified from acting in its case.

 In his response brief, Judge Platt indicates that he wanted Commissioner Kronlund to be aware of Mr. A’s name so that if he “came to court she would be able to hear it or not hear it.” He suggests that if he had not identified Mr. A in connection with the inquiry, the commissioner “would not have been in a position to properly address the fact of their brief conversation regarding the citation, and to disclose it to the parties if necessary pursuant to canon 3B(7)(d)(ii).” Canon 3B(7)(d)(ii) of the California Code of Judicial Ethics requires the disclosure of ex parte communications. A general inquiry concerning the procedures for handling traffic tickets does not become an ex parte communication until or unless it is linked to some specific case. Thus, Judge Platt appears to be admitting that by informing the commissioner that he was calling on behalf of Mr. A, he was making an ex parte communication that the commissioner might have to disclose under the canon. Absent some legitimate reason for the conveyance of the information, such an ex parte communication is a violation of the California Code of Judicial Ethics.

 Commissioner Kronlund did not appear before the masters. Instead, the parties submitted a stipulation in lieu of testimony. The stipulation recites that “Judge Platt did not ask Commissioner Kronlund to do anything with the ticket, such as dismissing or taking care of the ticket.” This does not mean that the commissioner did not recognize the phone call from the judge on behalf of his friend as an attempt to influence, even though she resisted the attempt.

 Broadman, supra, 18 Cal.4th at page 1092, quoting Doan, supra, 11 Cal.4th at page 312.

 Broadman, supra, 18 Cal.4th at pages 1111-1112, quoting Adams, supra, 10 Cal.4th 866, 912.

 Broadman, supra, 18 Cal.4th at page 1112, quoting Furey v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1318 [240 Cal.Rptr. 859, 743 P.2d 919].

 See, for example, Adams, supra, 10 Cal.4th 866 (Judge Adams was removed from office for engaging “in successive extrajudicial transactions that extended over a significant period of time, creating an appearance of serious impropriety and thereby tending to diminish the public esteem of the judiciary—a consequence petitioner either deliberately ignored or was unable to appreciate.” (10 Cal.4th at p. 914)); Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826 [264 Cal.Rptr. 100, 782 P.2d 239] (Kloepfer) (judge removed for a continuing, pervasive pattern of misconduct—four charges of willful misconduct and 21 charges of prejudicial conduct); McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186 [260 Cal.Rptr. 557, 776 P.2d 259] (Judge McCullough was removed for committing four acts of willful misconduct and one act of persistent failure to perform his judicial duties, and his failure to respond to a prior public censure evidenced a lack of regard for the commission, the court and his obligations as a judge).

 See also Kennick v. Commission on Judicial Performance, supra, 50 Cal.3d 297. There the Supreme Court declined to remove Judge Kennick from office because of misconduct noting that “it seems likely that our public censure of each of petitioner’s misdeeds would have led him to correct and improve his judicial behavior.” (50 Cal.3d at p. 341.) The court did remove the judge from office for his persistent failure or inability to perform judicial duties.

 Kloepfer, supra, 49 Cal.3d at page 848.

 Fletcher, supra, 19 Cal.4th at pages 920-921.

 Although Judge Platt indicated that he did not think there was anything wrong with his ex parte discussions with the officer and others, he reassured the masters that when he was in the district attorney’s office his expectation was that all the information that a judge would consider in deciding an issue of bail or O.R. would be presented in open court.

 The masters also note that Judge Platt initially testified, in response to Judge Hammerstone’s testimony that he had asked for the daughter’s release, that if he had wanted a person to get an O.R. release, he would have done it himself. However, when questioned by a master, Judge Platt admitted that, as he was not doing the felony master calendar and it was not a case that was pending before him, he would not have called the jail to authorize an O.R.

 See Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 287 [110 Cal.Rptr. 201, 515 P.2d 1],

 Fletcher, supra, 19 Cal.4th 865, 883, footnote 5, quoting Kloepfer, supra, 49 Cal.3d at page 838, footnote 6.

 The masters cited Adams, supra, 10 Cal.4th 866, 911-912.

 The special masters made “no finding as to whether Judge Platt is capable of rehabilitation, i.e. whether Platt can overcome his ‘rescuer’ personality trait that apparently has caused him to act to help friends or acquaintances solve their problems rightly or wrongly.”

 Judge Platt admits that his communications with Judge Holland and Commissioner Kronlund might suggest appearances of impropriety.

 This discipline is based on the commission’s findings and conclusions on counts one, two, three, four, six and eight. Although Judge Platt’s conduct as alleged in count five affirms Judge Platt’s pattern of practice, the discipline would be the same even if count five were dismissed.

 The Supreme Court has held that honesty is a minimum qualification expected of every judge. (Kloepfer, supra, 49 Cal.3d 826, 865.)